751 F.2d 662
 36 Fair Empl.Prac.Cas. 834,
35 Empl. Prac. Dec. P 34,858, 40 Fed.R.Serv.2d 898,
22 Ed. Law Rep. 108
 P.E. BAZEMORE, et al., Appellants,
v.
William C. FRIDAY, President of Consolidated University of
North Carolina, et al., Appellees.
P.E. BAZEMORE, et al., Appellants,
v.
William C. FRIDAY, President of Consolidated University of
North Carolina, et al., Appellees.
P.E. BAZEMORE, et al., Plaintiffs,
and
The United States of America, Appellant,
v.
William C. FRIDAY, President of Consolidated University of
North Carolina, et al., Appellees.
P.E. BAZEMORE, et al., Plaintiffs,
and
The United States of America, Appellant,
v.
William C. FRIDAY, President of Consolidated University of
North Carolina; et al., Appellees.
 Nos. 82-1873, 82-1881, 82-1927 and 82-2065.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 13, 1983.
Decided Dec. 10, 1984.
 
 David B. Marblestone, Washington, D.C. (Walter W. Barnett, Burton Craige, Dept. of Justice, William Bradford Reynolds, Asst. Atty. Gen., Charles J. Cooper, Deputy Asst. Atty. Gen., Washington, D.C., on brief), for appellant U.S.
 Eric Schnapper, New York City (Jack Greenberg, O. Peter Sherwood, New York City, Edward D. Reibman, Allentown, Pa., Cressie H. Thigpen, Jr., Thigpen, Blue & Stephens, Raleigh, N.C., on brief), for appellants P.E. Bazemore, et al.
 Howard E. Manning, Howard E. Manning, Jr. (Manning, Fulton & Skinner, Millard R. Rich, Asst. Atty. Gen., Raleigh, N.C., on brief), for appellees.
 Before WIDENER and PHILLIPS, Circuit Judges, and KELLAM, Senior District Judge.*
 WIDENER, Circuit Judge:
 
 
 1
 This is a race discrimination case in which the individual plaintiffs and the United States appeal from the judgment of the district court which rejected their claims of discrimination by the North Carolina Agricultural Extension Service.[1]
 
 
 2
 The case was filed in 1971 based on alleged violations of the First, Fifth and Fourteenth Amendments to the Constitution, 42 U.S.C. Secs. 1981 and 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d et seq. (prohibiting discrimination in programs receiving federal funds); and 7 U.S.C. Sec. 341 et seq. (funding authority of the United States Department of Agriculture). The United States intervened on the same causes of action. The complaints were both subsequently amended to incorporate alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq. (employment discrimination).
 
 
 3
 After a ten week trial, the district court rendered its decision in two separate opinions issued August 20 and September 17, 1982. In addition to an opinion on the broad aspects of the case such as the pattern and practice claims, the district court, by a separate opinion and order, dealt with and disposed of the individual claims.
 
 
 4
 On appeal, the individual appellants challenge the rejection of class certification and of their individual claims of race discrimination in their salaries and in the selection of County Extension Chairmen. They also challenge the district court's refusal to order the integration of the local 4-H clubs and Extension Homemaker clubs. The government and the individual appellants argue that the district court improperly concluded that a pattern or practice of racial discrimination was not proved with respect to the salaries of county-level employees and State Specialists, or with respect to the selection of County Chairmen. In addition, they claim that the district court improperly concluded that the Extension Service quartile system, used for merit pay and promotion evaluations, was valid. We affirm.
 
 
 5
 The district court made extensive factual findings regarding the structure and practices of the Extension Service, so only a brief review of the facts pertinent to the claims on appeal is necessary.
 
 
 6
 The Extension Service is a division of the School of Agricultural and Life Sciences of North Carolina State University (NCSU) at Raleigh. Upper level administrative positions in the Extension Service are faculty appointments in the School. At the county level, a County Extension Chairman (County Chairman) is in charge of each county's Extension Service office. In addition to substantive responsibilities among the Service's four program areas (agriculture, home economics, 4-H, and community resource development), he oversees the county's overall extension program and manages the county professional staff. The staff consists of assistant, associate, and full agents, who provide services in the program areas. Actual tasks are determined by each county's specific needs based on primary crops, geography, population, etc. Above the county level, a District Extension Chairman is responsible for the overall administration of the several counties within his district. He is in regular contact with the county professional staff and participates in performance reviews biannually. The Extension Service also has 12 District Program Leaders (responsible for one program in 2 districts) and approximately 25 State Specialists (essentially researchers in particular subjects, such as soybeans, cattle, horticulture, adult education), who are available to assist county staff members with specific programs. Many of the State Specialists work at NCSU in Raleigh.
 
 
 7
 When a vacancy exists for a County Chairman position, it is noted in the Extension Service monthly announcements. Applicants who meet objective requirements (experience and education) are interviewed separately by the Director of the Extension Service, his Associate Director, the Assistant Director for County Operations, and the relevant District Extension Chairman. The group then meets and makes a recommendation on the appointment to the Board of County Commissioners where the vacancy exists. Under a Memorandum of Understanding in effect between the Extension Service and the counties of North Carolina, the county Boards have authority to reject Extension Service recommendations.
 
 
 8
 The Extension Service has been in existence since long before the passage of the Civil Rights Act of 1964. Prior to 1965 it was divided into two branches, a white branch and a Negro branch. Both branches reported ultimately to the Director of the Extension Service. On August 1, 1965 (shortly after the effective date of the 1964 Civil Rights Act), the two branches were merged into a single organization. Salary disparities which had existed between the two branches were not immediately eliminated. By 1972, however, when public employers such as the Extension Service were required to comply with Title VII,[2] it had already been operating on a nondiscriminatory basis for about 6 years. Some pre-existing salary disparities continued to linger on nevertheless.
 
 
 9
 Since the merger, the Extension Service has set the minimum starting salary for all new county level agents. A salary differential is paid for a master's degree, prior relevant experience, and special skills. Once in the employ of a particular county office, however, each agent's salary is affected by a number of factors, not all within the control of the Extension Service. Each county contributes differing percentages of its local extension agents' salaries, ranging from a low of 18% in Camden County to a high of 57% in Forsyth County. The balance of agents' salaries is a combination of state and federal funds, paid by the Extension Service. Both the counties and the state legislature subsequently determine pay increases by their contributions to the salaries, sometimes in the form of a flat sum to each employee, sometimes as percentage raises. There is no uniform procedure for pay increases, and they are not always annual occurrences. In addition to regular salary increases, the State and about 10 counties provide funds for merit pay increases,[3] which are awarded based on the past year's job performance. The exact amount is determined by the amount of merit funds available in each county and the agents' job performance during the previous year, as measured by their performance according to the Extension Service quartile system and the Performance Review Guide. Increases to keep more senior employees' salaries above inflationary increases of entry level salaries are set by the Extension Service and also come out of merit funds. Thus, wide variations among salaries can and do develop with the passage of time.[4]
 
 
 10
 Under the quartile system, each employee is placed in one of four quartile groups annually by the District Extension Chairman. Placement is based upon an evaluation of the employee, using the Performance Review Guide. Under that system, employees of like grade and experience are placed in the first, second, third or fourth quartile according to their relative performance during the previous evaluation period, so that an employee in the first quartile has, in general terms, performed better than one in the second quartile, etc. Within each quartile, there is no ranking, however. The Performance Review Guide measures the performance of each employee against goals and objectives and performance of duties called for in his job description. The evaluation under the guide takes into account the observations of the County and District Extension Chairmen, program leaders and specialists. It also includes an interview or interviews with the agent himself who is required to sign the evaluation made of him according to the Performance Review Guide.
 
 
 11
 The Extension Service-sponsored local 4-H and Extension Homemaker clubs are established on a wholly voluntary basis at the community level. The Extension Service requires each club to be organized without regard to race and to certify that its membership is open to all races. Although voluntary membership may result in single-race clubs, all activities above the local community level are conducted on an integrated basis (including summer camps and area activities). The Extension Service provides services to local clubs equally, regardless of their racial makeup.
 
 
 12
 We proceed to the specific issues raised on appeal. Our review of the district court's findings of fact is subject to the clearly erroneous rule. FRCP 52(a); Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 A. Class Certification
 
 13
 In the district court the claims for class certification were quite broad, embracing a wide variety of alleged wrongs, which could have been based on race, in the operation of the Extension Service. On appeal, however, the claims have been somewhat narrowed and are that the district court erred in its refusal to certify classes consisting of: (1) all black employees of ... [the Extension Service] on or after November 18, 1971; (2) all black members and potential members of ... [the 4-H and Extension Homemaker Clubs] on or after November 18, 1971; \and (3) all County Commissioners in North Carolina who held that position on or after November 18, 1971. The first two classes mentioned are classes of plaintiffs, and the last a class of defendants.
 
 
 14
 In arriving at our conclusions, we have had the benefit of, and have taken into account, the findings of the district court at trial, for the plaintiffs pressed the question of class certification from time to time throughout the proceeding as late as argument of the case on the merits. This is not always, or even usually, the case, for the certification of classes at earlier times during a proceeding is many times required and should be as early as practicable. FRCP 23(c)(1). In this connection, we note that the intervention of the government in the case, asserting its broad pattern or practice claims which would have required relief as broadly based as the claimed plaintiffs' classes would have received, made it possible for the plaintiffs to introduce all evidence they would have been able to introduce had the classes been certified. All the questions on the merits were also presented to the court which would have been presented had the classes been certified. Thus, in a practical sense at least, even if not in a technical one, the complaint on appeal on account of failure of class certification may seem to be of little moment or was made moot by the intervention of the government.
 
 
 15
 The class of employees seeks to litigate the legality of Extension Service service to single race clubs, the existence of salary discrimination against black employees, and the existence of discrimination in the selection of employees for the position of County Chairman. While it is doubtful that the legality of Extension Service services to single race clubs is a proper subject of class representation by employees not members of the clubs, Hill v. Western Electric, 596 F.2d 99 (4th Cir.1979), it is discussed on its merits at the end of this opinion. The district court declined to certify the class of employees because there was no evidence that there existed any other potential class members, in addition to the named plaintiffs, who had been subjected to any alleged discriminatory employment practices of the defendants. While this finding is not clearly erroneous, it is qualified, as the district court found, by the fact that other witnesses testified on behalf of the pattern or practice claims who would have been members of the class had the pattern or practice claims succeeded. Thus, alone, it may not be sufficient to sustain the district court's ruling on that point.
 
 
 16
 An alternate reason for denying the class certification of the employees given by the district court was the lack of typicality of their claims under FRCP 23(a)(3). The salaries paid to the employees are made up from federal monies which are not in question here, appropriations from the state legislature, and the county governments involved. Increases are either across-the-board, merit, or percentage increases and one county in North Carolina has nothing whatsoever to do with the amount of increase given by another county. Thus, the claim of a potential plaintiff against one county will not be typical of the claim of another potential plaintiff against a different county. The same reasoning applies to the selection of the position of County Chairman. That selection is subject to approval of the county involved, and the fact that one county may discriminate in the selection of its county chairman has nothing to do with whether another county discriminates. Thus, we feel that the claims are not typical in the sense that they should support a class certification and are more nearly like those asserted in Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267 (4th Cir.1980), in which we held that promotion and pay decisions subject to almost complete local autonomy in the various offices of Southern Bell throughout North Carolina would not support the typicality requirement under FRCP 23(a)(3) for a statewide class of employees.
 
 
 17
 The second class of black members and potential members of the 4-H and Extension Homemaker Clubs was not certified as a class because the district court found there was no evidence that anyone was denied services or provided inferior services because of their race; neither, it found, was there any evidence that any black female had been denied membership in any Extension Homemaker Club or had been denied services or provided inferior services because of her race. The district court further found that in only one case had a black child been denied membership in a 4-H club because of his race, and this resulted in the prompt removal of the offending volunteer worker by the Extension Service. The court found there was no evidence whatever that any other black child was ever denied membership in a 4-H Club, or denied 4-H Club services, or provided inferior services by the Extension Service. It thus denied certification of the class. The plaintiffs do not take exception either to the findings of fact of the district court or to its conclusion that the class should not have been certified on the basis relied upon by that court. They say, however, that the district court misunderstood the issue, which is not whether "all white clubs reject black applicants on account of race, but what affirmative steps, if any ..., the Extension Service must require as a condition of state services and materials." Parenthetically, no issue is made of "materials" as contrasted to "services." The plaintiffs' statement of their proposition shows the flaw in their claim. While we do not think their present characterization of the issue is correct, but that the district court correctly defined the issue, even if the claim is properly made, it is at once apparent that if there has been no denial of membership or services on account of race, there has been no legally cognizable wrong.
 
 
 18
 The plaintiffs take exception to the district court's ruling that, under General Telephone Company v. EEOC, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), class action certification is inappropriate and unnecessary in pattern and practice suits brought by the EEOC and the government. We do not find it necessary and we do not pass upon the correctness of that ruling for the reasons stated just above, which we repeat for emphasis. The government's intervention in this case asserting its broad pattern and practice claims enabled the plaintiffs to have the benefit in the case of all the evidence they would have been able to introduce had their classes been certified. The relief sought by the government was also as broad as that asked for by the plaintiffs. The questions presented were as broad. Thus, the district court's alternate ruling that class certification was unnecessary and inappropriate in a pattern or practice case has no practical effect of any kind on the outcome of this case, and we think the resolution of that question is better left for another day.
 
 
 19
 The district court declined to certify the class of County Commissioner defendants because it found there "... was simply no evidence of any standardized practice among the 100 separate counties in the state to deprive anyone of any rights solely because of race." Again, this finding is not clearly erroneous.
 
 
 20
 The only way in which the counties were alleged to have acted to deprive plaintiffs of any rights because of race was because of the failure to hire black County Chairmen and because of pay increases of whatever nature granted by the counties. Yet, each county acted individually in its approval or disapproval of County Chairmen recommended for employment by the Extension Service. They acted according to no uniform ruling, and there is no allegation that they did. There is no allegation that the counties had anything to do with the circulation of information about job openings, or that the circulation of job openings was discriminatory. Indeed, there were no black applicants for county chairmen for most of the vacancies for the job in the counties in the State. With respect to pay, there is only one tiny facet of the district court's fact finding which could have favored the plaintiffs and the government, that counties designated to which individual employees raises were given, and that fact finding has been demonstrated by appellants to be clearly erroneous. Otherwise, pay increases granted by county governments were across-the-board, or for merit, or a percentage, and there is neither allegation nor proof that there was any discrimination by the counties in so awarding them.[5] The plaintiffs press their claim for the certification of that class of defendants under FRCP 23(b)(1)(B) that adjudications with respect to one county would as a practical matter be dispositive of the interests of other counties. Of course in this case that cannot be true. If Brunswick County in the southeastern part of the state, for example, had deprived a black applicant employment because of his race or deprived him of pay raises because of his race, that could have nothing to do with whether Ashe County in the northwestern part of the state had done the same thing. In this connection, two cases are persuasive, although decided under FRCP 23(b)(2). In Paxman v. Campbell, 612 F.2d 848 (en banc) (4th Cir.1980), we held that a class of defendants of 130 Virginia school boards was inappropriate when each was free to adopt maternity leave policies of entirely unknown differences or similarities, it being uncontradicted there was no statewide policy in force, centrally directed or otherwise. The Sixth Circuit followed Paxman in Thompson v. Board of Education, etc., 709 F.2d 1200 (6th Cir.1983), upon the same fact situation obtaining in Paxman. While those two cases were decided under a different part of the class action rule, the principle remains the same, that to have a proper class of defendants in a case such as this there must be either a statewide rule or practice so that relief is available if the rule or practice is invalid, or the adjudication with respect to a member of a defendant class must as a practical matter be dispositive of the interests of the other members of the class as provided in FRCP 23(b)(1)(B). Neither of those conditions is present here.
 
 
 21
 The decision of the district court declining to certify the class of county commissioner defendants is thus without error.
 
 B. Individual Salary Claims on Appeal
 
 22
 In addition to the denial of class certification, certain individual appellants appealed their claims of salary discrimination.
 
 
 23
 These salary claims were rejected by the district court. Simple salary comparisons were introduced to show some white agents who had no longer tenure or no more education earning more than the plaintiffs. Plaintiffs made no showing regarding their job qualifications and job performance which would raise their salary expectations to the level of an inference of discrimination.
 
 
 24
 In cases of individual disparate treatment, the showing of a simple disparity is not sufficient to make a prima facie case of discrimination. The rule of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), is that plaintiffs must show that they are qualified for an employment benefit which was denied them because of their race. Though evidence of salary disparities is relevant to the question at hand, the plaintiffs must show that they were qualified to be receiving a higher salary in order to shift the burden of production to the employer. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); Larson, 2 Employment Discrimination Secs. 50.22, 50.31(c) (1983). Lacking any data as to the relative qualifications of these plaintiffs compared to those who allegedly received higher salaries or as to the qualifications demanded by the jobs involved, the district court properly found no prima facie cases of disparate treatment had been made on behalf of these individual plaintiffs.
 
 
 25
 The individual appellants also raise on appeal the fact that they should be included in a class discriminated against which is the subject of the pattern and practice claims and discussed later in the opinion.
 
 
 26
 C. Wage Disparity Due to Pre-Act Discrimination
 
 
 27
 The plaintiffs claim that the pre-Act discriminatory difference in salaries should have been affirmatively eliminated but has not. We do not think this is the law. "A public employer who from that date forward [date of the Act] made all its employment decisions in a wholly non-discriminatory way did not violate Title VII even if it had maintained an all-white work force by purposefully excluding Negroes." Hazelwood School District v. United States, 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977). Along the same line, in United Airlines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), a present seniority and thus salary disparity which existed on account of a previous unlawful termination on account of sex which had resulted in loss of seniority was held not to be actionable when no complaint had been filed by the plaintiff on account of her unlawful termination, although the court acknowledged that "the seniority system gives present effect to a past act of discrimination," 431 U.S. at 558, 97 S.Ct. at 1889 (1977). To the same effect are Fowler v. Birmingham News Co., 608 F.2d 1055 (5th Cir.1979) (present effect of uncomplained of racially discriminatory placement on seniority list held not actionable); Trabucco v. Delta Airlines, 590 F.2d 315 (6th Cir.1979) (present lower pay and fringe benefits resulting from past uncomplained of unlawful reclassification on account of sex held not actionable); Cates v. Trans World Airlines, Inc., 561 F.2d 1064 (2d Cir.1977) (present adverse seniority effects resulting from an uncomplained of racially discriminatory refusal to hire are not actionable). See also Schlei and Grossman, Employment Discrimination Law (2d Ed.), p. 1053.D. Salaries
 
 
 28
 Much of the dispute in this case centers around salaries of the county agents, whether full agent, associate agent, or assistant agent. The claim is that the salaries of black agents were lower because of their race.
 
 
 29
 The district court correctly declined to compare or include the salaries of County Chairmen with those of the agents. There is about a $4000 average salary difference between chairman and agent to begin with. The chairman is the head of the county based employees of the Extension Service. He is not routinely promoted from agent; the method of his selection is entirely different, and counting the salaries of the County Chairmen together with those of the agents for purposes of analysis could only distort the result.
 
 
 30
 At the outset of this part of the discussion, certain matters admitted or found by the district court and not appealed are important to remember. There is no discrimination in hiring. There has been no discrimination in entrance salaries since 1965. Neither is there discrimination in promotion from assistant to associate to full agent. Pay raises are of three kinds from whatever source, percentage raises, across-the board raises, and merit raises. There is no discrimination in across-the-board and percentage raises. Everyone gets them.[6]
 
 
 31
 This leaves only two sources of any discriminatory salary differential, the lingering effects of pre-Act discriminatory pay and the administration of the quartile system of ranking of performance of agents. Under the quartile system, each agent is placed in the first, second, third, or fourth quartile, according to his performance for the previous period. Approximately equal numbers of agents are supposed to be placed in each quartile. So, while the placing of an agent in a quartile follows a review of his performance under the Performance Review Guide, because of the necessary division of the agents into four quartiles, the performance of one agent relative to another is bound to be considered. The assignment to a quartile is made by the District Extension Chairman periodically, and merit pay increases, as distinguished from across-the-board and percentage increases, are ordinarily granted to those agents in the top three quartiles, and from time to time an agent's higher quartile rank will result in a higher merit pay increase. Various counties contribute varying amounts of the agents' pay, and, indeed, agents are paid by two checks, one from the county, the other from the Extension Service. Some counties pay higher salaries than do others.
 
 
 32
 The plaintiffs, as did the defendants, introduced the testimony of a statistical expert. Each of the statisticians had performed a multiple regression analysis with respect to the salaries of the county agents. The plaintiffs' expert testified with respect to the years 1974, 1975 and 1981, while the defendants' expert testified with respect to 1975 and 1981. A regression analysis is a method for examining the relationships among large numbers of variables. Such an analysis indicates the degree to which changes in the value of one variable corresponds to the value of the other. Barnes, Statistics as Proof (1983), p. 293 et seq.
 
 
 33
 The plaintiffs' expert considered the variables of tenure, education, and race, and was of opinion there were statistically significant components of salaries attributable to race for the years 1974, 1975 and 1981, but he had not included job level or title (assistant, associate, or full agent) in his analysis. When job level was added, he did not find a statistically significant component in 1981. In the most general terms, the defendants' expert agreed for the years 1975 and 1981. He offered isolated data analyses, however, which tended to show no discrimination. He had included job title in his analysis. The district court refused to accept the plaintiffs' expert testimony as proof of discrimination by a preponderance of the evidence because the plaintiffs' expert had not included a number of variable factors the court considered relevant, among them being the across-the board and percentage pay increases which varied from county to county. The district court was, of course, correct in this analysis. It defies logic to compare the salary of an agent in a county which has granted many or large increases or pays high salaries with one in a county which has granted few or small increases or pays lower salaries. The across-the board and percentage pay increases granted by various counties in varying amounts, as well as simply paying higher salaries, are bound to have an effect on the salaries of the agents in the various counties. In addition, as such increases accumulate through the years, greater disparity from county to county may certainly be expected rather than less. Percentage increases for all employees also would increase the dollar amount of existing disparities, and dollar amounts are what the statisticians dealt with.
 
 
 34
 Most of plaintiffs' salary case is built upon the multiple regression analysis of their expert, and we think the district court was not required to accept that testimony as proof by a preponderance of the evidence. In the first place, the analysis contained salary figures which reflect the effect of pre-Act discrimination,[7] a consideration not actionable under Title VII but permissible to show the general background of the case, or intent, or to support an inference that such discrimination continued. Compare Hazelwood, p. 309 thereof and n. 15 of 433 U.S. and p. 2742 thereof and n. 15 of 97 S.Ct. with Lehman v. Trout, --- U.S. ----, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984). Since the data used by the statisticians included pre-Act hires, there is bound to have been a racial component in each of their regression analyses, for the Extension Service admits that, while it had made some adjustments to try to get rid of the salary disparity resulting on account of pre-Act discrimination, it has not made all the adjustments necessary to get rid of all of such disparity. The across-the-board and percentage pay increases granted by a county, as well as counties which simply pay higher salaries, also are bound to flaw the regression analyses since they were not taken account of. It is also apparent that percentage pay raises from whatever source will magnify any existing disparity. Leaving aside for the moment the question of merit pay increases, we do not believe the district court was required to accept the conclusions of the plaintiffs' expert for the reasons we have above set forth.
 
 
 35
 The conclusion of the district court that the multiple regression evidence was flawed is supported by authority. The purpose of multiple regression is to account for changes in a single variable through the examination of other variables which might be expected to influence that variable. In the present instance, that single variable is salary. An appropriate regression analysis of salary should therefore include all measurable variables thought to have an effect on salary level. Barnes, Statistics as Proof (1983), p. 339; Fisher, Multiple Regression in Legal Proceedings, 80 Colum.L.Rev. 702, 714 (1980). However, both experts omitted from their respective analysis variables which ought to be reasonably viewed as determinants of salary. As a result, the regression analyses presented here must be considered unacceptable as evidence of discrimination.
 
 
 36
 The merit pay increases are another matter. They are granted to agents in the first three quartiles but not in the fourth, so that if there were discrimination and black employees were assigned to a lower quartile, especially the fourth quartile, because of their race, there would be a salary disparity resulting on account of race.
 
 
 37
 On appeal, appellants rely upon quartile rankings by district and race for only one year, 1981, and we are told in the plaintiffs' brief, p. 40, n. 40, that for the year 1975 the quartile scores of black employees were relatively better than those of white employees. The 1981 rankings appear in the table just below:
 
 
 38
 QUARTILE RANKINGS
 BY DISTRICT AND RACE
DISTRICT QUARTILE
-------- ----------
 I II III IV
 W B W B W B W B
----------------------------------------------
NC 17 5 16 7 14 12 12 9
NE 12 2 13 3 10 5 8 3
NW 19 1 21 1 17 3 9 4
SE 22 1 18 9 14 6 10 7
SW 20 3 21 2 18 2 12 4
W 16 -- 16 -- 15 -- 13 --
----------------------------------------------
TOTAL 106 12 105 22 88 28 64 27
 
 
 39
 Lumping together the first three quartiles, for employees in those quartiles are the ones who get the merit pay increases, a standard deviation analysis, with the expected number of black employees in the first three quartiles as 75%, indicates no statistically significant variation in the assignment of quartile rankings. Under the rule formulated in Hazelwood, "more than two or three standard deviations" would be required to undercut the presumption that employment decisions were being made without respect to race. Hazelwood, 433 U.S. p. 311, n. 17, 97 S.Ct. p. 2743, n. 17. The following table shows the results here to be well below this threshold.[8]
 
 
 40
 Even if the expected occurrence in each district is instead the actual percentage of all employees in the district, black and white, which occurred in the first three quartiles in 1981, only one district could have any statistically significant variation under the Hazelwood analysis, as is shown in the table below. And in that one district (NW) a student's adjustment shows the variation not to be of statistical significance under the Hazelwood rule.[9]
 
 
 41
 We are unable to say that these statistics support a finding of discrimination in the assignment of quartile rankings.[10]
 
 
 42
 The upshot of the matter is that there are only two ways in which the salaries of the county agents may reflect a racially discriminatory effect. The first is because of the lingering effect of pre-Act discrimination, and the second is because of the assignment of quartile rankings, the only aspect of salary computation in which the Extension Service exercised any discretion. The first is not separately actionable, as we have previously set forth, and the second we do not think is supported by the record. Thus, the judgment of the district court with respect to salaries was without error.
 
 E. County Chairmen
 
 43
 The last subject we will dwell upon in any detail is that of selection of County Chairmen. The plaintiffs claim that this selection process has been flawed by racial discrimination, and the government as well as the named plaintiffs claim that the selection process has been flawed by a pattern or practice of discrimination.
 
 
 44
 Although there may be some repetition, some salient facts are worth repeating. The top administrative position in the Extension Service at the county level is that of County Chairman. Those holding that position have administrative and leadership responsibilities in addition to normally carrying a subject matter program work load depending on the needs of the county. The position is not within the promotional line from County Agent; it must be applied for separately, and the method of selection is neither akin to the hiring procedure for county agents nor to the process of their promotion. It is open to any qualified applicant. The minimum qualifications are six years (formerly seven) of service with the Extension Service or the equivalent, at least two years of which must have been in the service of the North Carolina Extension Service. A master's degree is desirable but is not required, but a bachelor's degree is required. While applicants are not required to be in the employ of the Extension Service, it is obvious that the requirement of two years' employment in that service in North Carolina will have the effect of causing the vast majority of the applications to be from employees of the Extension Service, which is what happened here.
 
 
 45
 When an impending vacancy becomes known, the District Chairman meets with the County Commissioners and reaches a decision as to the desired qualifications of the prospective applicants with respect to subject matter, knowledge, and competency. This is communicated to administrative officials in the Extension Service, and an announcement is made of the vacancy, not only to all the county agents but also to the various educational institutions from which the Extension Service recruits personnel. Each applicant meeting the minimum qualifications is interviewed by the district chairman, the assistant director for county operations, the associate director, and the director of the Extension Service. These people then meet and come to a decision as to whom they will recommend to the County Commissioners of the county to fill the vacancy. Sometimes only one applicant is recommended; sometimes more than one is recommended. The County Commissioners then must approve one of the recommended names, for the agreement of the Extension Service and the County Commissioners is required in order to fill the vacancy.
 
 
 46
 At the outset, we should say that the individual plaintiffs who testified in support of their claims that they had been discriminatorily denied selection to County Chairmen had their claims considered by the district court on evidence particularly applicable to each case. The district court found against each of them. These particular findings of fact and conclusions of law have not even been appealed except in the context of a refusal to find a pattern or practice of discrimination. So, there are no cases of actual discrimination to bolster a statistical case. The district court properly placed the burden of proof on the plaintiffs to prove their individual claims. Of course if the pattern and practice claims had been successful, then these plaintiffs, being in the class discriminated against, would have had the benefit of a presumption that they had been victims of the class discrimination, and the burden of proof would have been shifted to the defendants to prove that such claimants should not recover. Teamsters v. United States, 431 U.S. 324, 359, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), construing Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).
 
 
 47
 We will next proceed to an analysis of the statistical information which is relied upon to prove the pattern or practice claims. We must keep in mind that it is the Extension Service whose actions are complained of here, as distinguished from the action of the counties, so it is the "employment decisions," Hazelwood, 433 U.S. p. 309, 97 S.Ct. p. 2742, of the Extension Service which must be examined. In the context of this case, the employment decisions made by the Extension Service with respect to the selection of County Chairmen were made when the Service either recommended or did not recommend an applicant for an existing vacancy to the County Commissioners. Thus, it is the act of recommending or not recommending which we examine. The district court found that Title VII was made applicable to the Extension Service in 1972 and that claims under 42 U.S.C. Secs. 1981 and 1983 arising prior to November 18, 1968 would be barred by the statute of limitations. In this narrow aspect of the case, the bar of limitations prior to November 18, 1968, the plaintiffs, defendants, and the district court are in agreement. The district court found there had been no intentional discrimination proved which was necessary to maintain the case under Secs. 1981 and 1983, and analyzed the statistical evidence from 1972 on.
 
 
 48
 The appellants claim that, for 1962 through 1981, of 227 appointments to County Chairmen only 6 were black, and that, although blacks account for one-fourth of the full agents and one-fifth of the professional work force, they have received only 2.6% of the promotions to County Chairmen during that time. Although the claim is not specifically articulated, of course not more than 6% of the existing County Chairmen were black. Thus, they say these statistics only support a finding of discriminatory selection and thus a finding of a pattern or practice of discrimination.
 
 
 49
 The statistics as thus presented, however, do not tell the full story. There was no position of County Chairman prior to 1962-63, when it was created. A County Chairman was appointed in 1962-63 for each of the white county units, the Service then being segregated as previously related. Black county units did not have county chairmen but worked through the District Extension Chairmen. In 1964 one more, and in 1965, 6 more whites were appointed County Chairmen. In 1965, the black and white units of the Extension Service were merged and the then existing white chairmen became the County Chairmen of the county units of the integrated Extension Service. There were no appointments in 1966, and in 1967, 5 more white chairmen were appointed. Between 1968 and 1970, 31 more whites were appointed, and, in 1971, 3 more whites and one black were appointed. In March 1972, the Extension Service was placed under Title VII, and since that time the balance of the appointments to County Chairmen have been made. For the purpose of analysis, we assume that the naked figures presented above might support an inference of discrimination in the selection of County Chairmen, but, as Hazelwood, p. 309, 97 S.Ct. p. 2742, directs, an employer must be given an opportunity to prove that each of his post-Act employment decisions was made in a non-discriminatory way. In this respect, the gross statistics we have related above show that at least 104 of the appointments in question (1962-64) were made years prior to the time Title VII was effective and well prior to the time of the Civil Rights Act of 1964 which became effective in 1965. The six 1965 and five 1967 appointments are not actionable since the statute of limitations ran on all appointments before 1968, as the parties agree. Indeed, our examination of the record reveals little or no attempt to present precise data on the appointments prior to 1968. The data for the years from 1968 until the date of trial appears to be fairly complete. The holding of the district court that there was no intentional discrimination shown for the appointments prior to 1972 is not the subject of serious objection on appeal, but we have analyzed the data from 1968 forward so as not to rely upon that finding alone. In this pattern or practice case, we have not excluded post-Act 1965 data and 1967 data from our analyses because barred by limitations; it is just that we do not find it in the record.
 
 
 50
 The district court found that there had been 77 vacancies since the institution of statewide announcements of vacancies in 1972, and, of that number, blacks had not applied for 59 but had applied for 18 of the vacancies. It found that 18 individual blacks did apply for the 18 vacancies, that 5 of them were selected as County Chairmen by both the Extension Service and the county involved and that their rate of selection was 28% of the applicants. For the same 18 vacancies, the court found that there were 37 white applicants, of which 13 were selected as County Chairmen, or a selection rate of 35%. It held that since the black rate of selection was 80% of the white that it complied with the EEOC guideline in 29 C.F.R. Sec. 1604D which provides that a selection rate of a minority group of more than 4/5ths of the majority rate will generally not be regarded by federal enforcement agencies as evidence of adverse impact.
 
 
 51
 Appellants complain of the method of analysis of the district court. They say that the district court considered black applicants, not applications, so that those applicants who applied for more than one vacancy are only counted as one instead of two or more, thus increasing the percentage rate of black appointments. They also say that considering the vacancies for which blacks only applied but excluding the vacancies for which whites only applied further flaws the analysis by treating as irrelevant the vacancies for which whites only applied, but finding evidence of nondiscrimination by counting the vacancies for which blacks only applied. They say that the data should be analyzed only for positions for which both blacks and whites applied.
 
 
 52
 While there may be some justification for the method of analysis by the district court, if we should consider that discrimination is against people and not against applications, we think that, without deciding that either method is correct, a comparative analysis is worthwhile. We believe that a correct analysis of the data at this point in one respect, however, should not be either as the district court analyzed it or as appellants would have us do. The Extension Service is not separately responsible for the appointment to fill the vacancy, but it is separately responsible for the recommendation of one or more of the applicants. Thus, it is the action of the Extension Service upon each application that is its employment decision, and those are the employment decisions that we examine. The results of our examination are set out in the table below:
 
 
 53
 RECOMMENDATION RECORD OF THE NCAES FOR POSITIONS
 FOR WHICH BLACKS APPLIED, 1972-1981
--------------------------------------------------------------
 Applications Recommendations
 -------------- -----------------
Year County B W B W
---- --------------------- ------ ------ -------- -------
1972 No black applications
1973 Lenoir 2 7 1 3
1973 Iredell 1 3 0 1
1974 Northhampton 1 2 1 2
1975 Columbus 1 4 0 1
1975 Martin 1 3 0 1
1975 Wayne 1 4 0 1
1975 Iredell 2 2 0 1
1976 Johnston 2 6 1 2
1976 Union 1 1 0 1
1976 Cumberland 1 0 1 0
1977 Granville 1 2 1 1
1978 Pitt 1 0 1 0
1979 Warren 2 1 1 0
1980 Nash 1 2 0 1
1980 Anson 1 0 1 0
1980 Hertford 1 2 0 1
1981 Vance 1 2 0 1
1981 Hoke 1 1 1 0
 ------ ------ -------- -------
 TOTALS 23 44 9 18
 
 
 54
 Results for all vacancies for which blacks applied:
 
 
 55
 Black Recommendation Rate 9/23 = 39.1%
 
 
 56
 White Recommendation Rate 18/44 = 40.9%
 
 
 57
 Black Rate as Percentage of White Rate = 95.6%
 
 
 58
 Removing positions for which only blacks applied:
 
 
 59
 Black Recommendation Rate 6/20 = 30%
 
 
 60
 White Recommendation Rate 18/44 = 40.9%
 
 
 61
 Black Rate as Percentage of White Rate = 73.3%
 
 
 62
 It is apparent from the table, if we consider all of the vacancies for which blacks applied, the Extension Service recommended essentially the same percentage of black applicants as it did white applicants, for a difference of one recommendation would have made the black rate 112.5% of the white rather than 95.6% as shown. But, in accordance with appellants' contentions, if we remove the three vacancies for which blacks only applied and exclude also the vacancies for which whites only applied, the black recommendation rate of 30% of the applicants as opposed to the white recommendation rate of 40.8% shows a black rate of 73.3% of the white. While not within the EEOC guideline, a difference of one recommendation would have made the black rate 90.7% of the white because of the small numbers involved, again a figure well within the guideline.
 
 
 63
 As the table above indicates, we have used 19 vacancies which we find rather than 18 as used by the district court and the appellants. Using the district court's method of calculation for those vacancies, but using applications instead of applicants as appellants suggest, we find that blacks received 6 of the 19 appointments for which they applied. Six of the 23 black applications were ultimately successful, or 26.3%, while 13 of the 44 white applications were, or 29.6%. Eighty percent of the white rate would be 23.7%, and the black rate of appointment (26.3%) as compared to the white was 89%, well within the EEOC guideline.
 
 
 64
 With respect to the parties and the district court, however, we think that the correct method of analysis of this important data has not been advanced. We do not think that the applicant flow data should be analyzed as appellants wish us to do, using only vacancies for which both blacks and whites applied. Appellants' suggested method, instead of determining whether there was sufficient disparity in the approval rates of members of the class for a sufficient period of time from which discrimination might be inferred against the class, would narrow it down in each instance in the usual case to require an analysis of all the pending applications on the day the particular appointment was made. This would permit either a wide disparity in employment decisions or a wholly evenhanded employment policy to go either unnoticed or unconsidered by the observation of a small number of employment decisions. It also could, and most probably would, require a McDonnell-Douglas[11] analysis of each vacancy to ascertain as a preliminary matter whether the data with respect to that vacancy should be included in an applicant flow analysis.
 
 
 65
 We are of the opinion and hold that, on the data presented here, an analysis of all of the vacancies and the action on all of the applications for all of the vacancies is the proper way to consider the applicant flow data. See Hester v. Southern Ry., 497 F.2d 1374 (5th Cir.1974). This data is set out in the next table which appears below. We have used Government Exhibit 69 as the starting place for this table of vacancies and the action of the Extension Service with respect to them. Where no information is shown on that exhibit for other applications, we have assumed the successful applicant was the only one unless others as noted were found in those parts of the record we were examining. Where we could find no other recommendations for the vacancy, we have assumed the successful applicant was the only one. All of the vacancies in our table except three appeared on Government Exhibit 69.
 
 
 66
 The above data may be summarized as follows, leaving out of our computations the 3 employees whose race is not shown. Background data for the 11 vacancies occurring in 1965 and 1967 is sparse in the record, and we have not included them for that reason. Although the uniform notice of vacancies was not commenced until November 1972, Title VII became applicable to the Extension Service in March of that year, so we have included 1972 with subsequent years for the purpose of grouping data in the table and analysis.
 
 
 67
 Applications Recommendations
 -------------- -----------------
 B W B W
 ------ ------ -------- -------
1968-71 8 45 7 40
1972-81 23 213 9 91
1968-81 31 258 16 131
 
 
 68
 An analysis of the above data for the years 1968-71 shows 8 black applications with 7 approvals and 45 white applications with 40 approvals, a black approval rate of 87.5% and a white approval rate of 88.9%. The black approval rate was 98.4% of the white. For 1972-81 there were 23 black applications with 9 approvals and 213 white applications with 91 approvals, a black approval rate of 39.1% and a white approval rate of 42.7%. The black approval rate was 91.6% of the white. For the entire period 1968-81 there were 31 black applications with 16 approvals and 258 white applications with 131 approvals, a black approval rate of 51.6% and a white approval rate of 50.8%. The black approval rate was 101.6% of the white. Thus, considering all of the data which we have for all of the applications shows that for the entire period 1968-81 black applications were approved at a slightly higher rate than were the white applications, and in neither the 1968-71 period nor the 1972-81 period, breaking down the data, was the black approval rate lower than 91.6% of the white. Certainly all of this data for either of the two shorter periods, or for the entire period under consideration, is well within the EEOC guideline.
 
 
 69
 Hazelwood, 433 U.S. p. 308, n. 13, 97 S.Ct. p. 2742, n. 13, describes applicant flow data as "very relevant," and New York Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), at least expresses a preference for, and perhaps requires, applicant flow data in preference to more general data. Applicant flow data has been described as the most direct route to proof of racial discrimination in hiring in Hester v. Southern Railway Co., 497 F.2d 1374 (5th Cir.1974), and in United States v. County of Fairfax, Va., 629 F.2d 932, 940 (4th Cir.1980), we reasoned that "applicant flow data are normally highly relevant." In this case, we think the probative value of the applicant flow data far outweighs the evidentiary value of naked statistics consisting only of numbers of vacancies and the successful applicant by race. Other than the tables we have set forth above and our earlier discussion of vacancies and appointments, there is no other statistical evidence in the record. There is also no finding of any case of discrimination against an individual who sought the position of County Chairman.
 
 
 70
 When the complete applicant flow data is analyzed, far from showing any discrimination in the appointments to County Chairmen, the only conclusion it will permit is that the Extension Service made its employment decisions with respect to County Chairmen in as evenhanded a way as could be imagined or sought for within reason. The essence of the analysis of all the applications is that black applications for the position were approved at about the same rate as were white applications. If we assume that a prima facie case was made by the naked statistics consisting of vacancies and successful applicants from 1968 through 1981, it has been completely refuted by consideration of all of the applications, and even if the burden was upon the Extension Service to prove that its employment decisions were free from racial discrimination, it has done so.
 
 
 71
 We have considered the remaining assignments of error and are of opinion they are without merit.[128]
 
 
 72
 The judgment of the district court is accordingly
 
 
 73
 AFFIRMED.
 
 
 74
 JAMES DICKSON PHILLIPS, Circuit Judge, concurring in part and dissenting in part:
 
 
 75
 I dissent from so much of the judgment and the majority opinion as affirms dismissal of the salary and 4-H Club claims. As to both of those I would find reversible error and remand for further proceedings. I concur in the balance of the judgment.
 
 
 76
 * With regard to the salary discrimination claim, I would hold that the district court erred in its refusal to certify the class ultimately sought by the private plaintiffs; in its decision on the merits that no discriminatory "pattern or practice" had been proved; and in its rejection of the individual claims following its "no pattern or practice" conclusion.
 
 A.
 
 77
 The individual plaintiffs' challenge to the district court's refusal to certify a class consisting of "all black employees of [the Extension Service] on and after November 18, 1971," the date of commencement of the action, is well taken.
 
 
 78
 There was no possible basis for declining ultimately to certify such a class.
 
 
 79
 It clearly met the numerosity requirement. The number of black professional employees has been more than one hundred in each of the years involved. The proposed class would be even larger because of turnover during these years. These figures were undisputed.
 
 
 80
 The other basic criteria for class certification--commonality of issues, typicality of claims, adequacy of representation--were equally well established. The district court's refusal, early and late, to certify the class action was, however, obviously based upon a perception that these criteria were not met. Its stated reasons were two. Neither bears scrutiny.
 
 
 81
 The first was the court's apparent view, confirmed finally by its "no pattern or practice" conclusion on the merits, that the locus of decisions on salary matters was so far decentralized to the county level that a class action alleging a pattern or practice multi-county in its reach was not warranted. Citing to this court's decision in Hill v. Western Electric Co., 596 F.2d 99, 102 (4th Cir.1979) (Hill I ), the court concluded that "in employment discrimination cases ... all the plaintiff representatives and all the class members must be from the same work facility ...," and that here "the representative plaintiffs ... come from roughly thirty of the one hundred counties," so that "[i]n no sense can they be deemed to work within the same facility ...." App. 24.
 
 
 82
 This misconceived the holding of Hill I. That case laid down no per se rule preventing class certification in any multi-facility case (even assuming that the employment relationship here is sufficiently like that in the multi-facility industrial setting of Hill to warrant comparable general treatment). Hill simply applied to the multi-facility setting of that case the general rule that claims of representative plaintiffs must be typical of those of the class, that the representatives must also be situated adequately to represent the interests of class members, and that these criteria, along with the commonality of issues criterion, were not met where multiple facilities were essentially autonomous in respect of the employment decisions directly in issue. This was made plain in our later decision in Stastny v. Southern Bell Telephone and Telegraph Co., 628 F.2d 267 (4th Cir.1980). There, though certification was again found improper in a multi-facility setting, it was emphasized that the reason was not the setting itself, but the fact of facility autonomy. Id. at 277, 279 & n. 19.
 
 
 83
 Here, unlike the situations in both Hill I and Stastny, there was abundant proof, both preliminarily and increasingly during the course of trial on the merits, that despite local county contributions to salaries, hence some county-level participation in the salary decisions in issue, the dominant control over total salary levels lay ultimately in the state-level Extension Service. Thus, although it was undisputed that the level of county contributions to the salaries in question varied over the state, it was also clear from the evidence that ultimate salary level determinations, even of those putative class members working at the county level, were, as a matter of standard practice, subject to approval by Extension Service officials. This is revealed most dramatically in the recognition by Extension Service officials in 1971 that the race-based salary gaps dating back to pre-1965 overtly discriminatory practices must in prudence and by law now somehow be closed. Those officials plainly recognized and acted upon this necessity as a matter of Extension Service responsibility.
 
 
 84
 From this it was clear from the outset of this litigation, and only became clearer as it proceeded, cf. Stastny, 628 F.2d at 276, that the dominant issue of fact and law respecting the salaries of putative class members was not whether there was significant state-level control over those salary levels; that was beyond dispute. The only possibly disputable issue was whether that control was exercised in racially discriminatory ways in accordance with a pattern or practice similarly affecting all members of the putative class. Indeed, in the final analysis, the district court, in rejecting the "pattern or practice" claims advanced by the individual plaintiffs, recognized the claim's unmistakably appropriate class-action basis by referring to it as a "class-claim."
 
 
 85
 Which leads to the second, and probably more critical, basis for the district court's refusal to certify a salary-claim class. This was the court's stated perception that once the Government had intervened with its own "pattern or practice" claim respecting salaries, the private party class action question was essentially mooted. As the district court saw it, the government's claim, if meritorious, would be as efficacious to the putative class members as would have been a private class action in their behalf.
 
 
 86
 General Telephone Co. v. EEOC, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), directly refutes this. General Telephone held that a government pattern or practice suit need not be structured as a Rule 23 class action precisely because to do so would preclude, as class members, individuals who might prefer, and whom Congress intended could, proceed in individual or private class actions, seeking parallel relief. Id. at 333, 100 S.Ct. at 1707.
 
 
 87
 It was therefore prejudicial error to decline to certify the salary-claim class sought by plaintiffs.
 
 B.
 
 88
 Whether analyzed from the perspective of the Government's or the private plaintiff's "pattern or practice" claims,[1] I would then also find reversible error in the district court's rejection of that claim on the merits.
 
 
 89
 (1)
 
 
 90
 It is helpful at the outset to recall the now familiar features of the two-stage proceeding that has developed under Title VII for the prosecution of "pattern or practice" claims of disparate treatment, whether by private class action or government enforcement action.
 
 
 91
 In the first stage, the plaintiff need only establish by a preponderance of the evidence that a pattern or practice of disparate treatment has existed as a matter of an employer's regular and standard operating procedure. Hazelwood School District v. United States, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977); EEOC v. Ford Motor Co., 645 F.2d 183, 197-98 (4th Cir.1981), rev'd on other grounds, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). At this stage, the plaintiff need not attempt proof that any particular employees are specific victims of the pattern or practice in order to establish its existence. Teamsters, 431 U.S. at 360, 97 S.Ct. at 1867. Rather, as is customary, the plaintiff may rely primarily upon statistical evidence, bolstered by such other evidence as he may care to offer. See, e.g., EEOC v. American National Bank, 652 F.2d 1176, 1188 (4th Cir.1981).
 
 
 92
 Statistical evidence, either alone or in conjunction with other evidence, may carry the plaintiff's burden at this stage, though it is of course subject to rebuttal by demonstration of methodological flaws or inaccuracies. See id. If this burden is carried, the resulting finding of a discriminatory pattern or practice gives rise to an inference that all employees subject to the policy were its victims and are entitled to individually appropriate remedies. Teamsters, 431 U.S. at 362, 97 S.Ct. at 1868; Sledge v. J.P. Stevens & Co., 585 F.2d 625, 637 (4th Cir.1978). This leads to the second stage, in which individual claimants may attempt proof of their entitlement to individual remedies. Teamsters, 431 U.S. at 361-62, 97 S.Ct. at 1867-68. In this second stage individual claimants are entitled to a presumption that they are victims of the discriminatory pattern or practice established in Stage I, and the burden is thereupon on the employer to prove the contrary. Teamsters, 431 U.S. at 359 n. 45, 97 S.Ct. at 1867 n. 45; Sledge v. J.P. Stevens & Co., 585 F.2d 625, 637 n. 25 (4th Cir.1978).
 
 
 93
 (2)
 
 
 94
 In this case, the district court rejected the Stage I pattern or practice claim and, in consequence, never reached Stage II proceedings. In doing so, its finding that no cognizable pattern or practice of intentional racial discrimination in salaries had been established was clearly erroneous. This error is traceable to certain misapprehensions of controlling legal principles and to a failure by the court to accord any weight to certain evidence strongly probative of the claim. See Miller v. Mercy Hospital, 720 F.2d 356, 361 (4th Cir.1983).
 
 
 95
 Consideration must start with the undisputed fact that prior to the 1965 merger of white and Negro branches of the Extension Service, the salaries of black professionals were intentionally and quite openly simply set lower than those of white colleagues in the same employment positions. The differential was substantial at all levels and was maintained as a matter of general policy that reflected the cold fact--as testified by an Extension Service official at trial--that at that time blacks could simply be hired and retained at lower salaries than could whites in comparable positions.
 
 
 96
 Following the 1965 merger responsive to the Civil Rights Act of 1964, entry-level base salaries for whites and blacks in comparable professional positions were equalized. But substantial average differentials in all positions continued to exist, and the evidence clearly showed that in time these were reflected in the salaries of both pre-1965 and post-1965 hires. As to the former, because the pre-1965 gaps in base salaries had not been closed; as to the latter, because a significant gap developed once post-1965 hires had been employed long enough to move up from entry level positions. That these dual strands of substantial salary differentials continued well past 1965 and, more critically, well past 1968 (the earliest limitation date applicable to the salary claim[2]) was established by undisputed evidence.
 
 
 97
 Perhaps most dramatic was an internal memorandum prepared in 1971 by Dr. Blalock, then assistant director of the Extension Service budget, and an employee of the Service in pre-merger days. Presumably as a result of inquiries or self-prompted concerns about the implications of federal law for the continued maintenance of salary differentials, the memorandum first flatly conceded that "salaries for women and non-white men are lower. Our figures verify." This was attributed to several factors: "the competitive market" (recognized as "not acceptable as a reason though"); "tradition"; and "less county support for non-white positions."
 
 
 98
 Based on this, Blalock had urged in 1971 that action should be taken "as quickly as pos[sible] and preferably before our plan went into Washington." He warned:
 
 
 99
 Obviously one of the areas where we'll be checked is on salary. Easy to measure and at least see if there appears to be any [differential].
 
 
 100
 Blalock had then in fact gone so far as to calculate the salary adjustments needed to close the black/white salary differentials,[3] concluding that increases averaging in the range of $800 to $1100 for black professionals would be required.
 
 
 101
 There is no dispute that Blalock's general assessment of average salary differentials still existing in 1971 was accurate. But the evidence further disclosed, again without dispute, that though some general adjustments were then put into effect, they did not approach those calculated by Blalock as required to close the gaps. The adjustments were not in fact significant so far as redressing existing race-based differentials. For example, plaintiffs' evidence revealed, again without dispute, that the average gap between white and black agricultural agents at all ranks was then reduced by only $85; that the gap between black and white home economics agents actually increased by $13; and that in three of the six categories of professional employees of the Extension Service the average differentials increased in 1971 over those obtaining in 1970. Approximately a year and a half after the 1971 adjustments, an internal analysis by the Extension Service of the salaries being paid its full agents revealed that those of blacks still averaged $455 less than those paid whites with comparable educational levels and tenure.
 
 
 102
 From 1971 forward, average differentials between the salaries paid black and white professionals continued to decrease. But the evidence is clear that those average differentials were not substantially removed for home economics agents until 1974 and for agricultural agents until 1976.[4]
 
 
 103
 That these differentials persisted well into the applicable limitations periods was recognized by the district court, as the evidence compelled that it must be. The court observed of the 1971 "adjustments"--the first undertaken since 1965--that they only began to eliminate the differentials that had originated in pre-1965 overt discriminatory policies. And the district court recognized that the pattern of disparities continued well past that time.
 
 
 104
 There remained of course the question of motive--whether the clearly established pattern of salary differentials disfavoring blacks was, during the period of its post-1968 existence, "racially premised." See Teamsters, 431 U.S. at 335, 97 S.Ct. at 1854. While that motive might possibly have been inferred "from the mere fact of [the] differences in treatment," id. n.15, both sides presented additional evidence of motive in the form of regression analyses of statistical data.
 
 
 105
 For the government as plaintiff, Dr. Charles Mann presented regression analyses he had done for the years 1974, 1975 and 1981. Certain of these used four independent variables to assess effects upon salaries--race, education, tenure, and job title. His analyses demonstrated statistically significant racial effects for 1974 and 1975, and statistically insignificant racial effects for 1981. Specifically, it was demonstrated that in 1974 the average black professional earned $331 less than a white professional with the same education, tenure and job title; in 1975, $335 less; and in 1981, still $248 less.
 
 
 106
 A regression analysis commissioned by the Extension Service was entirely consistent with that of Dr. Mann for the same time period. Using the same independent variables, it demonstrated a racial effect of $364-$381 disfavoring black professionals as of October 1974.
 
 
 107
 Dr. Giesbrecht, an expert witness for the defendants, presented multiple regression analyses for 1975 and 1981. His results were also consistent with those of Dr. Mann. Using race, education, tenure and job level as independent variables, they demonstrated a statistically significant racial effect of $384 for the year 1975; a statistically insignificant racial effect of $310 for 1981. Giesbrecht also presented regression analyses for the same years that added as an independent variable "quartile rankings" that reflected job performance evaluation. For 1975, using this variable in addition to the others increased the race effect to $475; for 1981, it decreased the effect to a still statistically insignificant $142.
 
 
 108
 Notwithstanding the consistency of these analyses and the testimony of the experts on both sides that they demonstrated statistically significant salary differentials attributable to race that continued at least to some time after 1975, the district court declined to accord them any probative force.[5] The court reasoned, adopting a specific argument by defendants, that the analyses were fatally flawed by their failure to include nine other independent variables posited by defendants as potentially relevant.[6] At the same time, the court apparently rejected as irrelevant to the issue of motive any evidence other than the regression analysis offered by Dr. Mann. This appears from the court's conclusion that to the extent plaintiffs had established a prima facie case "it has only been by virtue of ... statistical evidence based on the multiple regressions of Dr. Mann." Finally, the court concluded that, in any event, the plaintiffs' statistical evidence was undermined by defendants' countering proof of the absence of significant salary differentials.
 
 
 109
 In all three of these critical determinations, the court was so clearly in error that its ultimate finding of no pattern or practice should not be allowed to stand.
 
 
 110
 As to the rejection of Mann's regression analyses (and along with it that of defendants' expert) for failure to include a number of other independent variables merely hypothesized by defendants, I completely agree with the government and the private plaintiffs that to apply such a rule generally would effectively destroy the ability to establish any Title VII pattern or practice claim by this means of proof. There is no authority of which I am aware that applies such a rule. As those parties rightly point out, it will always be possible for Title VII defendants to hypothesize yet another variable that might theoretically reduce a race-effect coefficient demonstrated by any multiple regression analysis that could be conceived. Merely hypothesizing other possible variables, no matter how rationally, should not suffice where, as here, a statistically significant race coefficient has been demonstrated by a regression analysis employing the most obvious alternative variables of tenure, education, and job position. Leaving out for the moment the bolstering effect of plaintiffs' non-statistical evidence of a race-based pattern or practice, the effect of the wholly consistent regression analyses here was unmistakably to make out a prima facie case requiring rebuttal by defendants. See Teamsters, 431 U.S. at 360, 97 S.Ct. at 1867; Chisholm v. United States Postal Service, 665 F.2d 482, 496 (4th Cir.1981). This might have been done, for example, by evidence that the inclusion of other relevant variables would in fact reduce the race-effect coefficient to a statistically insignificant level. But that simply had not occurred here. For all this record discloses, no one of the variables merely hypothesized by the defendants and relied upon by the court would have had any effect on the race-effect coefficient revealed in the regression analyses of both sides' experts.[7]
 
 
 111
 The court also erred in rejecting all evidence other than Mann's regression analysis as probative of a discriminatory pattern or practice. This dissenting opinion is no place to recapitulate all the other evidence that bolstered the inference of intentional discrimination past 1968. But such evidence abounds in the record. Perhaps most practically compelling is the concession by Blalock in 1971 that the pattern of overt race-based discrimination that originated in pre-merger days was then still in effect, in part at least because of "tradition." Coupled with this telling concession against interest was that responsible official's flat warning at the time that remedial action might in prudence be required to avoid difficulty with federal reviewing authorities. It is hard to imagine more weighty evidence of knowing, intentional continuation of acknowledged discriminatory policies.
 
 
 112
 Other evidence of a purposeful continuation of the practice well past 1971 was presumably disregarded by the district court in view of its stated reliance alone on the Mann regression analysis. Most critical were numerous specific examples of disparate pay between white and black professionals holding the same job positions, having comparable levels of tenure and education, and working in the same county offices at the same time.[8]
 
 
 113
 The continued existence of this clear pattern was in fact never sought to be rebutted on any basis that could conceivably have been thought to explain the pattern itself, as opposed to occasional specific examples. The defendants' suggestion that somehow merit (as reflected in the quartile rankings), or longevity, or a variance in salary supplements from county to county adequately and fully explained the continued existence of so widespread and substantial a pattern of disparate pay concededly race-based in its origins indeed bordered on the frivolous. On each of these points, the plaintiffs' evidence included numerous illustrations of pay differential that could not be explained on any of the non-racial grounds merely hypothesized by defendants.[9]
 
 
 114
 Indeed, anyone looking at this whole record, including some of the district court's own findings and observations could in fairness take only one view of it. It is this: that of course the general pattern of pre-1965 overt discrimination in salary continued in substantial, if gradually diminishing, degree until at least 1976 and perhaps beyond; that of course, the responsible officials of the Extension Service with responsibility and authority in the matter knew that the pattern continued during that time and that to some degree at least it included a carry-over race-based component from its pre-1965 origins; and that of course, so knowing, those officials allowed it to continue for a time when it lay within their power to remedy it.
 
 
 115
 If this be, as I am persuaded, the only rational assessment to be made of the evidence in this record, the question arises, and in fairness must be addressed: how then did the district court and the majority here fail so to assess it? In my judgment, the answers are readily found in misapprehensions of controlling legal principle, and not in any essential disagreement with my assessment of the facts clearly proven.
 
 
 116
 I identify three such basic legal misapprehensions by the district court.
 
 
 117
 The first has already been alluded to in Part IA: the court's perception that the salary pattern or practice alleged had not been shown to be class-wide in its reach because of county autonomy in salary matters. For reasons there indicated, this view is simply erroneous as a matter of law--whether applied to the class certification or merits issues.
 
 
 118
 The second has to do with the relevant time frame within which the existence of a pattern or practice of salary discrimination was to be assessed. That time frame commenced at least as far back as 1972 for the Title VII claims; it commenced as far back as 1968 for the constitutional and Title VI claims. While the district court specifically recognized this, its findings and conclusions unmistakably reveal at least a preoccupation, as the plaintiffs suggest, or perhaps a sole concern with the question whether a discriminatory pattern or practice continued to exist at the time of trial in 1981.
 
 
 119
 For example, the court rejected, presumably as irrelevant, a government comparison of black and white salaries earned in 1973 on the basis that it involved differences existing "about ten years ago," though this was well within all the applicable limitation periods. Again, the court in discussing the "seeming salary disparaties" revealed by plaintiffs' regression analyses over the period 1974-1981, concluded that on the basis of defendants' evidence respecting the years 1976-1981, the seeming disparities had been adequately explained. This defendants' evidence obviously had nothing to do with the years 1974-1975 covered by plaintiffs' regression analysis; and it certainly spoke not at all to the salary pattern before 1974, a time well within the limitation period. The impression is strongly conveyed that the court simply did not consider that it might be compelled to find a discriminatory pattern or practice of discrimination existing for at least some time after 1972 (or possibly 1968) even though it had been rectified by the time of trial. This of course was an erroneous view of the law.[10]
 
 
 120
 The third misapprehension has, possibly, to do with the nature of the discriminatory intent or motive that must be found to establish a pattern or practice claim and, possibly, with legal justifications that might excuse any discriminatory intent found to exist. In a frank and revealing passage, the court opined:
 
 
 121
 The Extension Service's problem of bringing black and white salaries into line has been similar to that which faced most business enterprises with a prior history of racial discrimination following the passage of the Civil Rights Act of 1964. Just as it had been found in the area of education that there is no such thing as instant integration, it was soon found in the field of business and industry that there is no such thing as instant equality in employment. Without risking serious disruption of a business by prohibitively costly budgetary alterations and a possible practice of wholesale reverse discrimination it was soon recognized (though not always by the courts) that the adjustments mandated by the law simply could not be made overnight. The dilemma of the Extension Service was further compounded by the fact that its operating funds come from three separate political entities each of which retains a voice in all major employment decisions.
 
 
 122
 This passage unmistakably reveals, first off, the court's recognition that a pattern of disparate treatment had been proven; the proferred legal justification or excuse for it that follows would not otherwise be required. Beyond that, it suggests two possible views of the legal significance of the pattern that are equally erroneous in law.
 
 
 123
 The first is that the intent required to prove a discriminatory pattern or practice could not be found in the mere continuation of a pattern or practice not originated by those presently charged with its existence. The other is that in any event even the intentional continuation of such a pattern or practice would be legally justified by the extreme difficulties of abandoning it.
 
 
 124
 Whatever the practical wisdom and accuracy of the court's observations, I agree with plaintiffs' position that nothing in controlling law supports its legal premises. Only those erroneous premises rather than the court's actual fact findings could possibly explain the court's conclusion that no pattern of illegal salary discrimination existed for periods extending well into covered time periods.
 
 
 125
 This court's opinion affirming the district court's rejection of the salary discrimination claim is, with respect, similarly flawed with basic legal error. Relying principally upon Hazelwood and United Airlines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the majority holds, in effect, that because the pattern of discriminatory salaries here challenged originated before applicable provisions of the Civil Rights Act made their payment illegal,[11] any "lingering effects" of that earlier pattern cannot (presumably on an indefinitely maintained basis) be considered in assessing a challenge to post-act continuation of that pattern.[12]
 
 
 126
 Hazelwood and Evans indeed made it clear that an employer cannot be found liable, or sanctioned with remedy, for employment decisions made before they were declared illegal or as to which the claimant has lost any right of action by lapse of time. For this reason it is generally true that, as the catch-phrase has it, Title VII imposed "no obligation to catch-up," i.e., affirmatively to remedy present effects of pre-Act discrimination, whether in composing a work force or otherwise. But those cases cannot be thought to insulate employment decisions that presently are illegal on the basis that at one time comparable decisions were legal when made by the particular employer. It is therefore one thing to say that an employer who upon the effective date of Title VII finds itself with a racially unbalanced work-force need not act affirmatively to redress the balance; and quite another to say that it may also continue to make discriminatory hiring decisions because it was by that means that its present work force was composed. It may not, in short, under the Hazelwood/Evans principle continue practices now violative simply because at one time they were not.
 
 
 127
 So, in this case, though there might theoretically be some question as to exactly when the challenged post-Act pattern or practice of salary discrimination could be said to have originated,[13] there can be no doubt that it was well established in its challenged form within applicable limitation periods. Indeed, with respect to pay and other "condition of employment" claims, as opposed to hiring and other work-force composition claims, it may well be argued that the "no-catch-up" principle simply has no logical application. Certainly, for example, it could not be contended that an employer could continue to maintain segregated dining facilities simply because they originated pre-Act.
 
 B.
 
 128
 As both the Government and the private plaintiffs rightly point out, the district court's erroneous conclusion that no pattern or practice had been established made also erroneous its denial of the claims of individual plaintiffs. Those plaintiffs, as members of the class sought to be certified (or as employees properly represented by the Government in its enforcement action) were entitled to have their claims determined with benefit of the "Teamsters presumption," see Teamsters, 431 U.S. at 359 n. 45, 97 S.Ct. at 1867 n. 45, a benefit denied them by the court's error. They are entitled, therefore, to have the judgments against them on their individual claims reversed and to participate as claimants in Stage II back-pay proceedings. Sledge v. J.P. Stevens & Co., 585 F.2d 625, 637-38 (4th Cir.1978).
 
 C.
 
 129
 Because of the district court's errors in failing to apply controlling principles of law to the indisputable evidence that defendants knowingly continued a pattern or practice of making and enforcing racially discriminatory salary decisions at least until 1976, I would reverse and remand. The court should be directed to enter judgment declaring that an illegal pattern or practice existed from 1968 until at least 1976, or such later date as the court might now find, and ordering Stage II back-pay proceedings in which individual employees within the class sought to be certified, including the individual plaintiffs whose claims were denied, might prosecute claims with benefit of the Teamsters -presumption. See EEOC v. American National Bank, 652 F.2d at 1201.
 
 III
 
 130
 The district court also erred in dismissing on the merits[14] plaintiffs' claim of constitutional and statutory violations in the state's maintenance of racially segregated 4-H and Extension Homemaker Clubs.
 
 
 131
 The salient facts, essentially undisputed, are these. The 4-H program is a major Extension Service activity, which receives substantial state and federal funding for whose administration the Extension Service is accountable. One of the program's critical features is the encouragement, financial support, and servicing of voluntarily organized 4-H and Extension Homemaker Clubs throughout the state.
 
 
 132
 Before 1965 these clubs were deliberately organized and operated, as was the Extension Service in all its features, on a racially segregated basis. In 1965, following passage of the 1964 Civil Rights Act, the Extension Service began and has since intermittently adopted a series of essentially ineffectual measures facially designed to "integrate" pre-1965 clubs and to avoid racial discrimination in the organization and operation of new clubs, as a part of its general program of mandated compliance with the requirements of Title VI of the Act.
 
 
 133
 The history of the Extension Service's adoption, rejection, compromise, interpretation and administration of those anti-discrimination measures is a checkered and confused one. Its ultimate form, however, can fairly be characterized as a freedom of choice approach to the membership composition of these clubs. Affirmative efforts to achieve effective integration of pre-1965 clubs and to avoid segregation in post-1965 clubs have consisted, on any fair assessment of this record, of announcing to Extension Service agents and to the public that the clubs are open to members of all races and forbidding the denial of membership to any applicant on the basis of race.
 
 
 134
 The actual effects of these desegregation compliance policies have, however, been minimal so far as the racial composition of local clubs is concerned.[15] Despite the emergence by 1972 of some new clubs integrated to some extent, the numbers of such clubs in relation to all-black and all-white clubs remained quite low. For example, in that year there were 22 Homemaker Clubs integrated to some degree, but still 1,378 clubs all white and 466 all non-white. Since 1965, the number of all-white 4-H Clubs has declined by only 8%; the number of single-race 4-H Clubs in ethnically mixed communities has declined by less than 2% since 1972.
 
 
 135
 As the plaintiffs rightly point out, the district court did not find, nor do the defendants make any serious claim, that the dual system of single race club membership required by the state before 1965 had been significantly disestablished at the time of trial. The court instead concluded, and the defendants here urge in effect, that this constituted no violation of applicable constitutional or statutory law. I disagree.
 
 
 136
 The district court essentially concluded that so long as all-white clubs were not proven at the time of trial to be rejecting black applicants on the basis of race, no violation either of Title VI or of the Constitution had been proven. This either misapprehended the nature of the plaintiffs' claims, or of the applicable law, or both.
 
 
 137
 The plaintiffs' claim necessarily has two prongs. The first relates to those present-day single-race clubs that were established before 1965 on a state-imposed segregated basis. As to these, plaintiffs rely on the fourteenth amendment and on a specific Department of Agriculture regulation promulgated under Title VI and having the force of law:
 
 
 138
 In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination. (Emphasis added.)
 
 
 139
 7 C.F.R. Sec. 15.3(b)(6)(i).
 
 
 140
 Plaintiffs claim, and I agree, that the evidence clearly shows that the state's essentially hands-off "freedom-of-choice" approach is demonstrably not "affirmative action to overcome the effects of prior discrimination," within the contemplation of this specific regulation, and that neither does it comply with affirmative obligations imposed directly by the Fourteenth Amendment to disestablish formerly segregated state-supported facilities. Such action as the state has taken in this respect suffers the same vice as did comparable freedom-of-choice plans adopted in ostensible response to the Supreme Court's mandate in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); it has proven not to work--for the same obvious reasons that school freedom of choice plans did not work. See Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). For the same reason that judicial remedies were available to insure the use of "other means" having more "realistic promise" to achieve the end compelled by law and constitution in school desegregation, so should a comparable judicial remedy be available here. See id. at 437, 88 S.Ct. at 1693.
 
 
 141
 The other prong of plaintiffs' claim relates to single-race clubs formed since 1965 in communities where there demonstrably exists a potential for mixed-race membership. As to those, the claim is that the state, through the Extension Service, intentionally countenances the continued organization and operation of these clubs, albeit by private parties, on a segregated basis, notwithstanding it has the means further to cause their desegregation.
 
 
 142
 That such clubs continue to exist is not disputed. That chance alone could account for their single-race composition is not suggested by anyone. The state's position, essentially accepted by the district court, is that no invidious discrimination could be found as the cause except on the basis of evidence that specific black applicants had been denied membership in all-white clubs. Because that evidence was not forthcoming, the district court rejected any claim of present invidious discrimination.
 
 
 143
 I believe that the court erred in not addressing the question whether a pattern of invidious discrimination was nevertheless proven independently of specific rejection of black applicants for club membership. That necessary inquiry--which should be made first instance by the district court--was simply avoided by the court's view that invidious discrimination could only be proven in the one way not proven. This clearly misapprehended controlling legal precedents for the means of proving invidious discrimination in this and related contexts. See, e.g., EEOC v. American National Bank, 652 F.2d at 1198-99 (discrimination in hiring by word-of-mouth recruitment by presently employed whites); Lea v. Cone Mills Corp., 301 F.Supp. 97, 102 (M.D.N.C.1969), aff'd in relevant part, 438 F.2d 86 (4th Cir.1971) (discrimination in hiring by "chilling").
 
 
 144
 I would reverse the district court's judgment respecting the 4-H Club claim, and remand for further proceedings. As to those clubs which demonstrably existed on a state-imposed segregated basis prior to the effective date of Title VI[16] I would direct entry of a remedial decree which required the state to "come forward with a new plan ... that promise[s] realistically," see Green v. County School Board, 391 U.S. at 439, 88 S.Ct. at 1694, to work in achieving the fullest measure of desegregation of those clubs practically possible; with submission of that plan to the court required for review and approval as a condition to further receipt of public funds.[17]
 
 
 145
 As to those all-white clubs formed since the effective date of Title VI that now exist in communities with potential for mixed-race membership, I would direct specific reconsideration, on a re-opened record, of the claim that they are so maintained by invidiously discriminatory practices knowingly countenanced and encouraged by the state through the Extension Service. In considering that claim, I would direct that evidence other than specific rejection of black applicants be considered and might suffice, if of sufficient probative force, to establish it. And I would direct that if such a claim were established, the court should enter a remedial decree comparable to that above described.
 
 
 146
 For these reasons, I dissent to the extent indicated.
 
 
 
 *
 United States District Court for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The Extension Service is administratively a part of North Carolina State University, whose chancellor and the Assistant Dean/Director of the Extension Service are also appellees. In addition, the President of the University of North Carolina system, William C. Friday, the Board of Governors of UNC, and Alamance, Edgecombe, and Mecklenburg Counties are appellees
 
 
 [2]
 P.L. 92-261 modified the definition of "person" in Title VII to include governments and governmental agencies as of March 24, 1972
 
 
 [3]
 The United States notes that the district court, based on the findings of fact submitted by the defendants, found that some counties designate which agent is to receive a merit increase out of its funds. The United States argues this statement is not supported by the evidence, and while the fact that a county designating which agent is to receive an increase is not generally accurate, the fact that counties do give increases to their own agents is amply supported by the record. We have, however, come across one incident in which a county raised its County Chairman's pay in order to keep him from moving elsewhere, and another where a county increased the pay of an agent who was acting county chairman pending selection of a permanent replacement
 
 
 [4]
 For example, County Chairmen salaries in 1971 ranged from $11,601 (Dare County) to $16,588 (Wake County), and similar disparities persist
 
 
 [5]
 For merit pay increase, see part D, infra
 
 
 [6]
 In arguing that the district court erred in finding no discrimination on the merits of the private plaintiffs' salaries claim, the dissent fails to take account of certain matters undisputed or not appealed by the plaintiffs. The dissent fails to mention that there has been no discrimination in hiring or in promotions, and no discrimination in entrance salaries since 1965. Because no dispute exists with respect to hiring, promotion, and post-1965 entrance salaries, the only discrimination that could exist would be in the quartile ranking system. As we demonstrate, however, the record does not support a finding of discriminatory effect in the assignment of quartile rankings. The dissent, nonetheless, on this subject as elsewhere addresses itself to certain weaknesses in the district court's opinion rather than the correctness of that court's judgment. Since we review judgments, not reasons, Eltra Corp. v. Ringer, 579 F.2d 294, 298 (4th Cir.1978), even erroneous reasoning does not require reversal so long as the judgment is correct
 
 
 [7]
 An inspection of the data bases for the regression analyses shows numerous pre-Act hires, both pre-1965 and pre-1972
 
 
 [8]
 The formula used to determine the amount of variation between the actual and expected occurrence percentages in terms of standard deviations is as follows:
 where a is the proportion of blacks actually in the first three quartiles, p is the proportion of all agents that would be expected to be in the first three quartiles, and n is the total sample size. See Moultrie v. Martin, 690 F.2d 1078, 1083, n. 8 (4th Cir.1982).
 n(p-a)
 /np(1-p)
 Total by District (Expected occurrence in first three quartiles--75%)
------------------
 Actual Ocurrence of Blacks
District in First 3 Quartiles
-------- --------------------------
NC 24/33 = .7273 Std. Dev. = 0.3012
NE 10/13 = .7692 Std. Dev. = (-)0.1599
NW 5/9 = .5556 Std. Dev. = 1.3469
SE 16/23 = .6957 Std. Dev. = 0.6014
SW 7/11 = .6364 Std. Dev. = 0.8701
W No Blacks in 1981
 
 
 [9]
 The student's t adjustment is done to accommodate the small sample size found in this district (nine blacks). The student's t distribution teaches that when the sample size is less than approximately thirty, the number of standard deviations must be increased in order to achieve the same significance level. See R. Winkler & W. Hays, Statistics: Probability, Inference, and Decision, 366 (2d ed. 1970)
 Total by District (Actual occurrences in each
-----------------
 district used as norm)
NC Expected Occurrence = 71/92 = .7717
 Actual Ratio Blacks = 24/33 = .7273
 Std. Dev. from Expected Ratio = .6077
NE Expected Occurrence = 45/56 = .8036
 Actual Ratio Blacks = 10/13 = .7692
 Std. Dev. from Expected Ratio = .3122
NW Expected Occurrence = 62/75 = .8267
 Actual Ratio Blacks = 5/9 = .5556
 Std. Dev. from Expected Ratio = 2.1487
 Student's std. dev. for sample size of 9
 at 95% confidence level = 2.306
SE Expected Occurrence = 70/87 = .8046
 Actual Ratio Blacks = 16/23 = .6957
 Std. Dev. from Expected Ratio = 1.3172
SW Expected Occurrence = 66/82 = .8049
 Actual Ratio Blacks = 7/11 = .6364
 Std. Dev. from Expected Ratio = 1.4103
W No Blacks in 1981.
 
 
 [10]
 Indeed, the comparisons made in this statistical analysis constitute a more advantageous analysis for the plaintiffs than might have otherwise been conducted. The present analysis defines the expected occurrence of blacks in the first three quartiles as either 75% or the actual occurrence ratio of an entire group of a district's agents. A more mathematically correct and appropriate analysis would define the expected occurrence ratio of blacks in the first three quartiles as the proportion of blacks in a district's population of agents. This ratio would then be compared to the actual proportion of blacks in the first three quartiles. The resulting standard deviations would then provide a more accurate reflection of any difference between the representation of blacks in a district's population of agents and the representation of blacks in the first three quartiles
 This type of comparison should be considered more precise in mathematical terms. Barnes, Statistics as Proof (1983), p. 228. More importantly, it permits the standard deviation analysis to focus on the essential issue of whether blacks are being represented in the first three quartiles in proportions similar to their representation in the population of agents. It is this comparison between the representation of a minority in a suspect group and its representation in a relevant larger population which was the principal focus in Hazelwood, and has been the preferred comparison in employment discrimination and like litigation. Castaneda v. Partida, 430 U.S. 482, 494-497, 97 S.Ct. 1272, 1280-1281, 51 L.Ed.2d 498 (1977) (racial discrimination in grand jury selection); Teamsters v. United States, 431 U.S. 324, 337-338, 97 S.Ct. 1843, 1855-1856, 52 L.Ed.2d 396 (1977) (racial discrimination in hiring).
 In this instance, a comparison of the Hazelwood standard with the standard deviation analysis used in the body of the opinion establishes that our use there of 75% or actual occurrence ratios as the expected ratio was done to present the plaintiffs' position in the best possible light. It is not a precedent to be followed: the Hazelwood standard rather is the rule. The application of a standard deviation analysis to the representation of black agents in the first three quartiles as compared to their representation in a district's agent population fails to produce any standard deviations greater than one. Under the Hazelwood comparison, these results made the evidence even less convincing that quartile assignments were a function of racial discrimination. The table below summarizes the data:
 District Expected Actual
-------- ----------- -----------
NC .358(33/92) .338(24/71)
NE .232(13/56) .222(10/45)
NW .12(9/75) .081(5/62)
SE .264(23/87) .229(16/70)
SW .134(11/82) .106(7/66)
 
 
 [11]
 McDonnell-Douglas v. Greene, 411 U.S. 792, 793, 93 S.Ct. 1817, 1820, 36 L.Ed.2d 668 (1973)
 
 
 [12]
 GX69 (A1736); Tr. 95 (Sasser); GX172.1 at 54-9, 95 (Sasser Dep.)
 
 
 [13]
 GX69 (A1736); A. 792, 915-6; Tr. 3666, 4005-7 (Blalock)
 
 
 [14]
 GX69 (A1736); Tr. 4922 (Black)
 
 
 [15]
 GX69 (A1736)
 
 
 [16]
 GX69 (A1736); Tr. 4927 (Black)
 
 
 [17]
 GX69 (A1736)
 
 
 [18]
 GX69 (A1736)
 
 
 [19]
 GX69 (A1736)
 
 
 [20]
 GX69 (A1736)
 
 
 [21]
 GX69 (A1736); Tr. 3847, 4375 (Blalock), 4687-88 (Black), 5562 (Dew)
 
 
 [22]
 GX69 (A1736); Tr. 92 (Sasser)
 
 
 [23]
 GX69 (A1736); Tr. 3833, 4375 (Blalock), 4715-22, 4877 (Black), 5706 (Patterson), 6488 (Hunter)
 
 
 [24]
 GX69 (A1736); A. 795, Tr. 3669 (Blalock); Tr. 5548, 5598 (Dew); GX169.1 at 49-50 (Patterson Dep.)
 
 
 [25]
 GX69 (A1736); Tr. 6399-6402 (Yancey)
 
 
 [26]
 GX69 (A1736); Tr. 3847 (Blalock), 4682-87 (Black). But see GX166.1 at 115-16 (Liner Dep.--claims Belfield sole other applicant)
 
 
 [27]
 GX69 (A1736); Tr. 4922-23 (Blalock)
 
 
 [28]
 DX67-46 (Montgomery County Folder); Tr. 4923 (Blalock)
 
 
 [29]
 DX67-97 (Surry County Folder); Tr. 4925 (Blalock)
 
 
 [30]
 DX67-96 (Stokes County Folder); Tr. 4926 (Blalock)
 
 
 [31]
 GX69 (A1736)
 
 
 [32]
 GX69 (A1736)
 
 
 [33]
 GX69 (A1736)
 
 
 [34]
 GX69 (A1736); Tr. 1935 (Barber), 3859-60, 4375 (Blalock), 4677-82, 4849 (Black)
 
 
 [35]
 GX69 (A1737)
 
 
 [36]
 GX69 (A1737); Tr. 6393 (Liner)
 
 
 [37]
 GX69 (A1737)
 
 
 [38]
 GX69 (A1737)
 
 
 [39]
 GX69 (A1737)
 
 
 [40]
 GX69 (A1737); A. 918 (Blalock); Tr. 1893-95 (Cooper), 3858, 4010, 4375 (Blalock), 4703-5 (Black)
 
 
 [41]
 GX69 (A1737)
 
 
 [42]
 GX69 (A1737)
 
 
 [43]
 GX69 (A1737)
 
 
 [44]
 GX69 (A1737); GX172.1 at 92 (Sasser Dep.)
 
 
 [45]
 GX69 (A1737)
 
 
 [46]
 GX69 (A1737); A. 796, Tr. 3670 (Blalock); Tr. 4827-8 (Black), 5598 (Dew); GX172.1 at 54-59, 94 (Sasser Dep.)
 
 
 [47]
 GX69 (A1737); A. 793-4, Tr. 3667-8 (Blalock); Tr. 4944 (Black), 5965 (Meldau)
 
 
 [48]
 GX69 (A1737); Tr. 4929 (Black)
 
 
 [49]
 GX69 (A1737)
 
 
 [50]
 GX69 (A1737); A. 745, Tr. 3617-18 (Blalock)
 
 
 [51]
 GX69 (A1737); A. 1004, Tr. 3821, 4375 (Blalock); Tr. 2530 (James)
 
 
 [52]
 GX69 (A1737)
 
 
 [53]
 GX69 (A1737)
 
 
 [54]
 GX69 (A1738)
 
 
 [55]
 GX69 (A1738); A. 794, Tr. 3668 (Blalock); Tr. 4928 (Black), 5962 (Meldau); GX167.1 at 13-15 (Meldau Dep.)
 
 
 [56]
 GX69 (A1738); Tr. 1613, 1617 (Murfree); A. 792-4, 1004, Tr. 3666-68, 4375 (Blalock); A. 1069, Tr. 4659 (Black); A. 1356-58, Tr. 5829-31, 5876 (Dobbins)
 
 
 [57]
 GX69 (A1738); A. 793, Tr. 3667 (Blalock); Tr. 5964 (Meldau); GX167.1 at 13-15 (Meldau Dep.)
 
 
 [58]
 GX69 (A1738). But see Tr. 5863 (Dobbins claims Jernigan sole applicant)
 
 
 [59]
 GX69 (A1738)
 
 
 [60]
 GX69 (A1738); A. 1005, Tr. 4376 (Blalock); Tr. 1397-98, 1420 (McNeil)
 
 
 [61]
 RX69 (A1738)
 
 
 [62]
 GX69 (A1738)
 
 
 [63]
 GX69 (A1738); Tr. 4669-76, 4841 (Black), 5605 (Dew)
 
 
 [64]
 GX69 (A1738)
 
 
 [65]
 GX69 (A1738)
 
 
 [66]
 GX69 (A1738)
 
 
 [67]
 GX69 (A1738)
 
 
 [68]
 GX69 (A1738); A. 1005, Tr. 3819-24, 4376 (Blalock); Tr. 94 (Palmer), 2529 (James), 4691-94 (Black), 5880 (Dobbins), 6421 (Lynn)
 
 
 [69]
 GX69 (A1738)
 
 
 [70]
 GX69 (A1738); A. 797, Tr. 3671 (Blalock); Tr. 5547 (Boone)
 
 
 [71]
 GX69 (A1738); A. 797, Tr. 3671 (Blalock); Tr. 5547-8 (Boone), 5597, 5602, 5691 (Dew)
 
 
 [72]
 GX69 (A1739)
 
 
 [73]
 GX69 (A1739); A. 1005, Tr. 4376 (Blalock)
 
 
 [74]
 GX69 (A1739)
 
 
 [75]
 GX69 (A1739)
 
 
 [76]
 GX69 (A1739); Tr. 4924 (Black)
 
 
 [77]
 GX69 (A1739); A. 1005, Tr. 4376 (Blalock)
 
 
 [78]
 GX69 (A1739); A. 1005, Tr. 3861-2, 4376 (Blalock); Tr. 2779, 2792-97 (Edwards)
 
 
 [79]
 GX69 (A1739); A. 1005, Tr. 4376 (Blalock)
 
 
 [80]
 GX69 (A1739)
 
 
 [81]
 GX69 (A1739); Tr. 5548, 5597 (Dew)
 
 
 [82]
 GX69 (A1739)
 
 
 [83]
 GX69 (A1739)
 
 
 [84]
 GX69 (A1739); A. 1005, Tr. 4376 (Blalock); Tr. 1010, 1014-15 (Belfield), 5639 (Dew), 5866 (Dobbins)
 
 
 [85]
 GX69 (A1739)
 
 
 [86]
 GX69 (A1740)
 
 
 [87]
 GX69 (A1740); A. 1005, Tr. 4376 (Blalock)
 
 
 [88]
 GX69 (A1740)
 
 
 [89]
 GX69 (A1740); Tr. 1355 (Hyatt), 1821-22 (McDaniel), 4654-58, 4816 (Black). But see GX152.1 at 55-58 (Andrews Dep.) (claims W.N. Payton, a black, was also recommended; our table accepts the district court's finding that only McDaniel was recommended)
 
 
 [90]
 GX69 (A1740); Tr. 5550 (Dew)
 
 
 [91]
 GX69 (A1740)
 
 
 [92]
 GX69 (A1740)
 
 
 [93]
 GX69 (A1740); GX150.1 at 32-5 (Dew Dep.)
 
 
 [94]
 GX69 (A1740)
 
 
 [95]
 GX69 (A1740)
 
 
 [96]
 GX69 (A1740); A. 1006, Tr. 4377 (Blalock); Tr. 1324-25 (Hyatt)
 
 
 [97]
 GX69 (A1740); A. 795, Tr. 3669 (Blalock)
 
 
 [98]
 GX69 (A1740); A. 1006, Tr. 4377 (Blalock); Tr. 983-85 (Grimes), 1310, 1316-17 (Hyatt); GX148.1 at 46-8, 85, addendum item 23 (Jones Dep.)
 
 
 [99]
 GX69 (A1740); GX 162.1 at 12-13 (Haas Dep.)
 
 
 [100]
 GX69 (A1740)
 
 
 [101]
 GX69 (A1741)
 
 
 [102]
 GX69 (A1741)
 
 
 [103]
 GX69 (A1741); Tr. 2248-49, 2252, 2264-66 (Godfrey); GX151.1 at 30-32 (Dobbins Dep.)
 
 
 [104]
 GX69 (A1741)
 
 
 [105]
 GX69 (A1741); Tr. 1736-37 (Lloyd)
 
 
 [106]
 GX69 (A1741); Tr. 828-9 (Strowd)
 
 
 [107]
 GX69 (A1741)
 
 
 [108]
 GX69 (A1741)
 
 
 [109]
 GX69 (A1741)
 
 
 [110]
 GX69 (A1741)
 
 
 [111]
 GX69 (A1741). P. E. Bazemore was informed he would be recommended to the county but withdrew due to salary considerations before any action was taken. Tr. 3825-26 (Blalock)
 
 
 [112]
 GX69 (A1741). See Also Tr. 827 (Strowd) (Thompson sent to Chowan county unwillingly--more like a transfer than open recruitment)
 
 
 [113]
 GX69 (A1741)
 
 
 [114]
 GX69 (A1741); GX150.1 at 32-35 (Dew Dep.)
 
 
 [115]
 GX69 (A1741)
 
 
 [116]
 GX69 (A1741)
 
 
 [117]
 GX69 (A1741)
 
 
 [118]
 GX69 (A1741); GX150.1 at 32-35 (Dew Dep.)
 
 
 [119]
 GX69 (A1741); GX150.1 at 32-35 (Dew Dep.)
 
 
 [120]
 GX69 (A1742); A. 795, Tr. 3669 (Blalock); Tr. 1309-10, 1318 (Hyatt), 1417 (McNeil), 6342 (Woodard); GX152.1 at 55-58 (Andrews Dep.)
 
 
 [121]
 GX69 (A1742)
 
 
 [122]
 GX69 (A1742); Tr. 5837-38 (Dobbins); GX151.1 at 33-34 (Dobbins Dep.)
 
 
 [123]
 GX69 (A1742); Tr. 1297 (Hyatt), 1828, 1819-20, 1838 (McDaniel)
 
 
 [124]
 GX69 (A1742)
 
 
 [125]
 GX69 (A1742); Tr. 1309-10, 1322 (Hyatt), 1887-90 (Cooper), 3855-56 (Blalock), 6342 (Woodard); GX152.1 at 55-58 (Andrews Dep.)
 
 
 [126]
 GX69 (A1742)
 
 
 [127]
 GX69 (A1742)
 COUNTY YEAR APPLICATIONS RACE RECOMMENDATIONS
---------------- -------- ----------------------- ------- -----------------
Hoke[12] 1981 Willie Featherstone B Willie
 Featherstone
12 GX69 (A1736); Tr. 95 (Sasser); GX172.1 at 549, 95 (Sasser Dep.)
 Ellen Willis W
Chowan[13] 1981 Mike Williams W Mike Williams
13 GX69 (A1736); A. 792, 9156; Tr. 3666, 40057 (Blalock).
 Zackie Harrell W
 Henry Riddick W Henry Riddick
Rutherford 1981 Steven West W[14]
14 GX69 (A1736); Tr. 4922 (Black).
 Dewey Hennessee W
 Eugenia Ware W Eugenia Ware
Pamlico[15] 1981 Fred May W Fred May
15 GX69 (A1736).
 R. Ray Harris W
Rockingham 1981 Frank Green W Frank Green[16]
16 GX69 (A1736); Tr. 4927 (Black).
Avery[17] 1980 J. M. Pittman W J. M. Pittman
17 GX69 (A1736).
 Johnnie Hensley W
Clay[18] 1980 John Reeves W John Reeves
18 GX69 (A1736).
Cabarrus[19] 1980 Alvin M. Stanford W Alvin M. Stanford
19 GX69 (A1736).
 William Triplett W
McDowell[20] 1980 James R. Mabe W James R. Mabe
20 GX69 (A1736).
Vance[21] 1980 Donald Cobb W Donald Cobb
21 GX69 (A1736); Tr. 3847, 4375 (Blalock), 468788 (Black), 5562 (Dew).
 Phyllis Stainback W
 Fred Belfield B
Ashe[22] 1980 James Carey W James Carey
22 GX69 (A1736); Tr. 92 (Sasser).
 Robert F. Breland W
 Dana Tugman W
Hertford[23] 1980 John W. Dunham W John W. Dunham
23 GX69 (A1736); Tr. 3833, 4375 (Blalock), 471522, 4877 (Black), 5706
Pattersson), 6488 (Hunter).
 James Daughtry W
 James E. Wright B
Perquimans 1980 W. R. Jester W W. R. Jester[24]
24 GX69 (A1736); A. 795, Tr. 3669 (Blalock); Tr. 5548, 5598 (Dew); GX169.1
at 4950 (Patterson Dep.).
 (Juster, Jessup?)
 Ken Bateman W Ken Bateman
 Henry C. Riddick W
Anson[25] 1980 Hoover Royals B Hoover Royals
25 GX69 (A1736); Tr. 63996402 (Yancey).
Nash[26] 1980 James Stephenson W James Stephenson
26 GX69 (A1736); Tr. 3847 (Blalock), 468287 (Black). But see GX166.1 at
11516 (Liner Dep.--claims Belfield sole other applicant).
 Fred Belfield B
 Bryan Page W
Buncombe[27] 1980 George Biddix W George Biddix
27 GX69 (A1736); Tr. 492223 (Blalock).
 J. B. Reeves W
 Reagon Ammons W
Montgomery 19?? R. C. Reece W R. C. Reece[28]
28 DX6746 (Montgomery County Folder); Tr. 4923 (Blalock).
Surry[29] 19?? John Waddell W John Waddell
29 DX6797 (Surry County Folder); Tr. 4925 (Blalock).
Stokes[30] 19?? Susan Hilton W Susan Hilton
30 DX6796 (Stokes County Folder); Tr. 4926 (Blalock).
Cleveland[31] 1979 B. F. Spencer W B. F. Spencer
31 GX69 (A1736).
Robeson[32] 1979 John Richardson W John Richardson
32 GX69 (A1736).
 M. K. Dennis W
Lee[33] 1979 John Hall W John Hall
33 GX69 (A1736).
 Fay T. Donnell W
 Clarence J. Cameron W
Jones[34] 1979 M. C. Small W M. C. Small
34 GX69 (A1736); Tr. 1935 (Barber), 385960, 4375 (Blalock), 467782, 4849
Black)s.
 Charles Hammond W
 Fletcher Barber B
Northampton 1979 Bill Rogister W Bill Rogister[35]
35 GX69 (A1737).
Vance[36] 1979 James Stephenson W James Stephenson
36 GX69 (A1737); Tr. 6393 (Liner).
 Phyllis Stainback W
 Marshall Bowden W
Hanover 1979 C. E. Lewis W C. E. Lewis[37]
37 GX69 (A1737).
 Thoams Dail W
 Harvey Morris W
 James E. Warren W
Caswell[38] 1979 L. N. White W L. N. White
38 GX69 (A1737).
 Donna Pointer W
Pamlico[39] 1979 Reginald Piland W Reginald Piland
39 GX69 (A1737).
Warren[40] 1979 L. C. Cooper B L. C. Cooper
40 GX69 (A1737); A. 918 (Blalock); Tr. 189395 (Cooper), 3858, 4010, 4375
Blalockk), 47035 (Black).
 George Koonce B
 Emily Ballinger W
Onslow[41] 1979 Dan Baucom W Dan Baucom
41 GX69 (A1737).
 Charles Hammond W
 Chase Padgett W
Bladen[42] 1979 M. K. Dennis W M. K. Dennis
42 GX69 (A1737).
 Harvey Morris W
Moore[43] 1979 C. E. Hammond W C. E. Hammond
43 GX69 (A1737).
 Tom Colson W
 Paul Seabolt W
 Clarence Cameron W
Davie[44] 1979 W. E. Mainous W W. E. Mainous
44 GX69 (A1737); GX172.1 at 92 (Sasser Dep.)
 Judge A. Pierce W
 Ronnie Thompson W
Yancey[45] 1979 James Ray W James Ray
45 GX69 (A1737).
 Carlos Bickford W
 Johnny G. Hensley W
Forsyth[46] 1979 J. D. Carroll W J. D. Carroll
46 GX69 (A1737); A. 796, Tr. 3670 (Blalock); Tr. 48278 (Black), 5598 (Dew);
GX172.1 at 5459, 94 (Sasser Dep.).
 W. E. Mainous W X
 Worth Gurkin W Worth Gurkin
 Al Stanford(?) W
Randolph[47] 1979 Talmadge Baker W Talmadge Baker
47 GX69 (A1737); A. 7934, Tr. 36678 (Blalock); Tr. 4944 (Black), 5965
Meldau)).
 Dick Peterson W
 Drue Finette W
 Richard Freeman W
 Doug Young W
 Rodney Haines W Rodney Haines
Wayne[48] 1978 Wesley Townsend W Wesley Townsend
48 GX69 (A1737); Tr. 4929 (Black).
 John H. Wynne W
 William Lamm W
Rowan[49] 1978 James H. Caudill W James H. Caudill
49 GX69 (A1737).
 Rodney Haines W
Duplin[50] 1978 Lois Britt W Lois Britt
50 GX69 (A1737); A. 745, Tr. 361718 (Blalock).
 Robert Swain W
 S. B. Wilson W
Pitt[51] 1978 Leroy James B Leroy James
51 GX69 (A1737); A. 1004, Tr. 3821, 4375 (Blalock); Tr. 2530 (James).
Polk[52] 1977 O. R. Ammons W O. R. Ammons
52 GX69 (A1737).
 Carlos P. Bickford W
 Judy M. Groff W
Bertie[53] 1977 W. J. Griffin W W. J. Griffin
53 GX69 (A1737).
Mitchell[54] 1977 David Terrell W David Terrell
54 GX69 (A1738).
Alleghany[55] 1977 Helen Dosier W Helen Dosier
55 GX69 (A1738); A. 794, Tr. 3668 (Blalock); Tr. 4928 (Black), 5962
Meldau)); GX167.1 at 1315 (Meldau Dep.).
 William Fowler W
 Walden M. Hearn W
 Jim Weaver W Jim Weaver
Granville[56] 1977 Frank Baker W Frank Baker
56 GX69 (A1738); Tr. 1613, 1617 (Murfree); A. 7924, 1004, Tr. 366668, 4375
Blalockk); A. 1069, Tr. 4659 (Black); A. 135658, Tr. 582931, 5876
Dobbinss).
 I. W. Murfee B I. W. Murfee
 Dorothy Wilkinson W
Watauga[57] 1977 Gene Brewer W Gene Brewer
57 GX69 (A1738); A. 793, Tr. 3667 (Blalock); Tr. 5964 (Meldau); GX167.1 at
1315 (Meldau Dep.).
 Bill Fowler W Bill Fowler
Wilson[58] 1977 C. H. Jernigan W C. H. Jernigan
58 GX69 (A1738). But see Tr. 5863 (Dobbins claims Jernigan sole applicant).
 Frank Baker W
Greene[59] 1977 R. A. Hayes W R. A. Hayes
59 GX69 (A1738).
Cumberland 1976 B. T. McNeil B B. T. McNeil[60]
60 GX69 (A1738); A. 1005, Tr. 4376 (Blalock); Tr. 139798, 1420 (McNeil).
Lincoln[61] 1976 David Choate W David Choate
61 RX69 (A1738).
 A. L. Smith W
 Howard Waynick W
Wake[62] 1976 V. B. Lynn W V. B. Lynn
62 GX69 (A1738).
Union[63] 1976 M. C. Howell W M. C. Howell
63 GX69 (A1738); Tr. 466976, 4841 (Black), 5605 (Dew).
 P. E. Bazemore B
Brunswick[64] 1976 R. M. Coleman W R. M. Coleman
64 GX69 (A1738).
 Dan E. Baucom W
 M. K. Dennis W
Swain[65] 1976 C. D. Bunn W C. D. Bunn
65 GX69 (A1738).
 Roger Hyatt W
Transylvania 1976 Robert R. Hyatt W Robert R. Hyatt[66]
66 GX69 (A1738).
 Roger Hyatt W
 James H. Ray W
 Dennis Winters W
 Linda Best W
Cabarrus[67] 1976 E. E. Bishop W E. E. Bishop
67 GX69 (A1738).
 J. P. Bowles W
Johnston[68] 1976 Bruce Woodard W Bruce Woodard
68 GX69 (A1738); A. 1005, Tr. 381924, 4376 (Blalock); Tr. 94 (Palmer), 2529
James),, 469194 (Black), 5880 (Dobbins), 6421 (Lynn).
 David Stanaland W
 Frank Baker W Frank Baker
 Harold Lloyd W
 Peter Westerbeck W
 H. F. Palmer B
 James Stephenson W
 Leroy James B Leroy James
Alamance[69] 1975 Millis B. Wright W Millis B. Wright
69 GX69 (A1738).
 Richard J. Freeman W
Buncombe[70] 1975 D. R. Burnette W D. R. Burnette
70 GX69 (A1738); A. 797, Tr. 3671 (Blalock); Tr. 5547 (Boone).
 C. P. Bickford W X
 J. D. Brooks W
 Nancy Stancil W
 Robert Hyatt W
Stanly[71] 1975 J. F. Simpson W J. F. Simpson
71 GX69 (A1738); A. 797, Tr. 3671 (Blalock); Tr. 55478 (Boone), 5597, 5602,
5691 (Dew).
 Carroll Baker W Carroll Baker
 Ray Kiser W
 Frederick J. Rivers W
Pender[72] 1975 W. F. Walker W W. F. Walker
72 GX69 (A1739).
 Dan E. Baucom W
 J. G. Richardson W
 John Wynne W
Iredell[73] 1975 Kenneth Vaughn W Kenneth Vaughn
73 GX69 (A1739); A. 1005, Tr. 4376 (Blalock).
 D. O. Ivey B
 S. D. Little B
 Jack Smith, Jr. W
Beafort[74] 1975 M. C. Griffin W M. C. Griffin
74 GX69 (A1739).
 H. C. Riddick W
 Jack Cullipher W
 R. M. Pilch W
 W. M. Hearn W
 Gordon Sawyer W
 Steve Warrick W
 Gaylon Ambrose W
 Harvey Morris W
Person[75] 1975 F. J. Rivers W F. J. Rivers
75 GX69 (A1739).
 M. B. Wright W
Tyrrell[76] 1975 F. S. Voliva W F. S. Voliva
76 GX69 (A1739); Tr. 4924 (Black).
Wayne[77] 1975 T. S. Godwin W T. S. Godwin
77 GX69 (A1739); A. 1005, Tr. 4376 (Blalock).
 Frank Baker W
 William Lamm W
 Wesley Townsend W
 B.T. McNeil B
Martin[78] 1975 L. L. Allen W L. L. Allen
78 GX69 (A1739); A. 1005, Tr. 38612, 4376 (Blalock); Tr. 2779, 279297
Edwardss).
 R. M. K. Edwards B
 C. J. Cameron W
 P. C. Bryant W
Columbus[79] 1975 G. D. McCullen W G. D. McCullen
79 GX69 (A1739); A. 1005, Tr. 4376 (Blalock).
 M. K. Dennis W
 Harold Lloyd W
 Harvey Morris W
 John Spaulding B
Pasquotank 1974 Donald Baker W Donald Baker[80]
80 GX69 (A1739).
 W. M. Hearn, Sr. W
 J. R. Vaughn W
 Harvey Morris W
 Victor Lynn W
Burke[81] 1974 H. L. Miller W H. L. Miller
81 GX69 (A1739); Tr. 5548, 5597 (Dew).
 R. M. Bowden W
 Roger Hyatt W
 Robert Hyatt W
 Latham Smith W Latham Smith
Alexander[82] 1974 B. G. Westbrook W B. G. Westbrook
82 GX69 (A1739).
 Roger Hyatt W
 Kenneth Patterson W
Caswell[83] 1974 M. C. Small W M. C. Small
83 GX69 (A1739).
Northampton 1974 E. J. Long W E. J. Long[84]
84 GX69 (A1739); A. 1005, Tr. 4376 (Blalock); Tr. 1010, 101415 (Belfield),
5639 (Dew), 5866 (Dobbins).
 Fred Belfield B Fred Belfield
 Doug Eason W Doug Eason
Wilkes[85] 1974 H. M. Ramseur W H. M. Ramseur
85 GX69 (A1739).
 M. B. Wright W
Watauga[86] 1974 W. C. Richardson W W. C. Richardson
86 GX69 (A1740).
 Gene R. Brewer W
 Rodney Haines W
 Agnes A. Greene W
 Henry B. Hagwood W
 Harold Lloyd W
 C. D. Bunn W
 James W. Gentry W
 Patrick Guyer W
Iredell[87] 1973 Alvin Stanford W Alvin Stanford
87 GX69 (A1740); A. 1005, Tr. 4376 (Blalock).
 D. O. Ivey B
 H. M. Stoney W
 H. W. Myers W
Haywood[88] 1973 Herman McCall W Herman McCall
88 GX69 (A1740).
 H. Leslie Miller W
Lenoir[89] 1973 W. S. Lamm W W. S. Lamm
89 GX69 (A1740); Tr. 1355 (Hyatt), 182122 (McDaniel), 465458, 4816
Black)s. But see GX152.1 at 5558 (Andrews Dep.) (claims W.N. Payton, a
black, was also recommended; our table accepts the district court's finding
that only McDaniel was recommended).
 John H. Wynne W
 W. N. Payton B
 G. E. McDaniel B G. E. McDaniel
 R. L. Stroud W
 Walter C. Johnson W Walter C. Johnson
 T. S. Godwin W
 C. H. Jernigan W C. H. Jernigan
 F. H. Baker W
Montgomery 1973 Walter Bowers W Walter Bowers[90]
90 GX69 (A1740); Tr. 5550 (Dew).
Stokes[91] 1973 Jack Barnes W Jack Barnes
91 GX69 (A1740).
 M. B. Wright W
 C. J. Cameron W
Catawba[92] 1972 Edwin Nolley W Edwin Nolley
92 GX69 (A1740).
Davidson[93] 1972 W. C. Holtzman W W. C. Holtzman
93 GX69 (A1740); GX150.1 at 325 (Dew Dep.).
 Wade Johnson W
 Latham Smith W
Tyrrell[94] 1971 Fred Rivers W Fred Rivers
94 GX69 (A1740).
Nash[95] 1971 William Shackelford W William
 Shackelford
95 GX69 (A1740).
Durham[96] 1971 Carl Hodges B Carl Hodges
96 GX69 (A1740); A. 1006, Tr. 4377 (Blalock); Tr. 132425 (Hyatt).
Harnett[97] 1971 James Goff W James Goff
97 GX69 (A1740); A. 795, Tr. 3669 (Blalock).
 Connie Jernigan W Connie Jernigan
Gates[98] 1970 Zackie Harrell W Zackie Harrell
98 GX69 (A1740); A. 1006, Tr. 4377 (Blalock); Tr. 98385 (Grimes), 1310,
131617 (Hyatt); GX148.1 at 468, 85, addendum item 23 (Jones Dep.).
 C. M. Grimes B
 Mr. Baker W Baker
Mecklenburg 1970 Phil Haas W Phil Haas[99]
99 GX69 (A1740); GX 162.1 at 1213 (Haas Dep.).
 Max Irving W
 Bill Bowers W
 Wallace Flynt W
Edgecombe 1970 Joe Perry W Joe Perry[100]
100 GX69 (A1740).
Madison[101] 1970 Earl Wise W Earl Wise
101 GX69 (A1741).
Macon[102] 1970 Robert Rollins W Robert Rollins
102 GX69 (A1741).
 George Conrad
 Earl Wise W
Green[103] 1970 Walter Johnson W Walter Johnson
103 GX69 (A1741); Tr. 224849, 2252, 226466 (Godfrey); GX151.1 at 3032
Dobbinss Dep.).
 Daniel Godfrey B Daniel Godfrey
 Frank Baker W Frank Baker
 W X
Moore[104] 1970 Talmadge Baker W Talmadge Baker
104 GX69 (A1741).
Granville 1970 Aubrey Hardee W Aubrey Hardee[105]
105 GX69 (A1741); Tr. 173637 (Lloyd).
Perquimans 1970 Richard Bryant W Richard Bryant[106]
106 GX69 (A1741); Tr. 8289 (Strowd).
Transylvania 1970 Jerry Purser W Jerry Purser[107]
107 GX69 (A1741).
Yancey[108] 1970 William Bledsoe W William Bledsoe
108 GX69 (A1741).
Henderson 1970 Grover Westmoreland W Grover[109] Westmoreland
109 GX69 (A1741).
Avery[110] 1970 W. W. Avery W W. W. Avery
110 GX69 (A1741).
 Leslie Miller
 Woodie Richardson
Montgomery 1970 Robert Wesson W Robert Wesson[111]
111 GX69 (A1741). P. E. Bazemore was informed he would be recommended to the
county but withdrew due to salary considerations before any action was taken.
Tr. 382526 (Blalock).
Chowan[112] 1970 Raymond Thompson W Raymond Thompson
112 GX69 (A1741). See Also Tr. 827 (Strowd) (Thompson sent to Chowan county
unwillinngly--more like a transfer than open recruitment).
Craven[113] 1970 Ed Simpson W Ed Simpson
113 GX69 (A1741).
Yadkin[114] 1969 Samuel Young W Samuel Young
114 GX69 (A1741); GX150.1 at 3235 (Dew Dep.).
Pitt[115] 1969 Edwin Yancey W Edwin Yancey
115 GX69 (A1741).
Camden[116] 1969 Gordon Sawyer W Gordon Sawyer
116 GX69 (A1741).
Hertford[117] 1969 Enos Register W Enos Register
117 GX69 (A1741).
Alleghany 1969 William Corbin W William Corbin[118]
118 GX69 (A1741); GX150.1 at 3235 (Dew Dep.).
Alleghany 1969 Roger Murdock W Roger Murdock[119]
119 GX69 (A1741); GX150.1 at 3235 (Dew Dep.).
Orange[120] 1969 Ebert Pierce W Ebert Pierce
120 GX69 (A1742); A. 795, Tr. 3669 (Blalock); Tr. 130910, 1318 (Hyatt),
 1417 (McNeil), 6342 (Woodard); GX152.1 at 5558 (Andrews Dep.).
 Frank Emory B Frank Emory(?)
 S. N. Shelton B S. N. Shelton
 Bruce Woodard W
Union[121] 1969 John Stacy W John Stacy
121 GX69 (A1742).
Cumberland 1969 Bruce Woodard W Bruce Woodard[122]
122 GX69 (A1742); Tr. 583738 (Dobbins); GX151.1 at 3334 (Dobbins Dep.).
 B. T. McNeil B B. T. McNeil
 Dalton Proctor W Dalton Proctor
Alexander 1968 Henry Ramseur W Henry Ramseur[123]
123 GX69 (A1742); Tr. 1297 (Hyatt), 1828, 181920, 1838 (McDaniel).
 George McDaniel B George McDaniel
 X W X
 Y Y
Carteret[124] 1968 James Bunce W James Bunce
124 GX69 (A1742).
Warren[125] 1968 Laverne Hardage W Laverne Hardage
125 GX69 (A1742); Tr. 130910, 1322 (Hyatt), 188790 (Cooper), 385556
Blalockk), 6342 (Woodard); GX152.1 at 5558 (Andrews Dep.).
 L. C. Cooper B L. C. Cooper
Guilford[126] 1968 John Crawford W John Crawford
126 GX69 (A1742).
Tyrrell[127] 1968 Murray Goodwin W Murray Goodwin
 
 
 [127]
 GX69 (A1742)
 
 
 [128]
 The dissent takes issue with the failure of the Extension Service to affirmatively integrate the entirely voluntary membership of local 4-H and Extension Homemaker Clubs in racially mixed communities. The balance of all activities are completely integrated. Absent proof of alleged racial discrimination, the mere existence of all white and all black 4-H and Extension Homemaker Clubs in some racially mixed communities violates neither Title VI nor the equal protection clause of the fourteenth amendment. The record is totally devoid of any proof of discrimination with respect to services provided by any 4-H or Extension Homemaker Club. Moreover, the record shows no proof of any discrimination with respect to membership in any Extension Homemaker Club. While the record indicates one incident in which a voluntary worker told a black child he was not welcome in a white 4-H club, the Extension Service at once removed the voluntary worker and admitted the black child to membership in the 4-H club. Especially since the plaintiffs failed to prove their allegations of discrimination, the district court correctly denied the plaintiffs' claim with respect to the alleged affirmative duty to require integrated membership in local Extension Homemaker and 4-H Clubs in racially mixed communities
 Even assuming that the record contained evidence of discrimination, it would yet be doubtful if plaintiffs are entitled to the relief sought because no evidence in the record exists to show that any plaintiff was denied membership in, or services of, any Extension Homemaker Club or 4-H Club. Consequently, if any party has a complaint it would seem to be the United States, which, significantly, chose not to appeal this issue. We do not decide that issue in this case, however, because the total absence of proof is fatal to plaintiffs' claim.
 
 
 [1]
 For sake of simplicity, I confine discussion of the salary claims to their grounding in Title VII and the Constitution. The Title VI ground, also available to the Government, must be essentially congruent, being rested on the prohibition against public funding of segregated facilities
 
 
 [2]
 In addition to the claim under Title VII, which only arose in 1972, the salary claim was based on Title VI, forbidding since 1965 discrimination in programs receiving federal funds, and on constitutional provisions proscribing intentional race discrimination by state action. As to the latter claims, a limitation period of three years applied to the action which commenced on November 18, 1971
 
 
 [3]
 The professional work-force then employed by the Extension Service obviously included both pre- and post-merger hires, a fact manifest to Blalock or anyone else knowledgeable as was he about the recent history of the Service
 
 
 [4]
 If, as plaintiffs plausibly contend, the average differentials should be adjusted by a tenure longevity factor, the gap-closing dates are substantially later, and may not have been closed fully by trial time
 
 
 [5]
 The district court's rejection of Dr. Mann's regression analysis also, inevitably, involved rejection of Giesbrecht's which concededly employed the same methodology and data bases. Supporting the district court's position, the defendants are forced to the position--which seems clearly taken--of similarly repudiating their own expert witness testimony
 
 
 [6]
 The suggested variables were as follows:
 (1) Performance of agents measured against the agents' plan of work;
 (2) The variations in salaries created by across the board state raises with the different percentage of state contributions in each county;
 (3) The across the board increases in agent salaries by some counties and not in others;
 (4) The merit raises provided by the state;
 (5) The merit raises provided for by the counties in which Extension Service personnel have no input;
 (6) The merit raises provided by the counties with limited or full participation in the merit recommendation by Extension Service personnel;
 (7) The range in merit salary increases provided by the counties (0 to 12% in 1981);
 (8) Prior and relevant experience; and
 (9) Variations in salary due to market demands both at time of hire and later for agents with skills in short supply or prior experience.
 
 
 [7]
 Indeed, one variable--merit--merely suggested by defendants as possible explanation for the differential was worked into the regression analyses. The result, however, was to increase the demonstrated race-effect, rather than decrease it. The Giesbrecht analysis for 1975 incorporated a quartile-ranking variable which presumably reflected merit evaluation. It had the effect indicated
 On this point, the majority opinion's painstaking standard deviation analysis of the effects of quartile rankings on the plaintiffs' claim, at 672-673, does no more than support the district court's rejection of plaintiffs' discrete claim that the ranking system itself was violative of Title VII as an unvalidated test. I am prepared to accept it for that limited purpose without accepting the propriety of the majority's first instance standard deviation analysis of statistical proof based on the size samples here involved, or the majority's apparent understanding of the import of the Hazelwood "more than two or three standard deviations" rule. See EEOC v. American National Bank, 652 F.2d at 1192-93 ("Within the range of one to three standard deviations ... we do not see how a court can properly find the ... hypothesis [of] discrimination dispelled by [the standard deviation] analysis alone.").
 To show, by whatever means, that the quartile ranking system did not itself violate Title VII does not however undercut the probative force of a regression analysis that did not use quartile rankings as an additional independent variable to test for race-effect. In short, that a discriminatory race-effect could not be traced solely to the quartile ranking system obviously does not also show that discrimination did not exist by virtue of other specifically identifiable causes or, indeed, unidentifiable causes. The majority, in fact, asserts that the race-effect demonstrated by all the regression analyses could be attributable only to the quartile ranking system or to the "lingering effects of pre-Act discrimination." At 674. As will be shown, the fact that such lingering effects are traceable to pre-Act discrimination does not, as the majority believes, insulate it as a discriminatory post-act practice.
 
 
 [8]
 Much of this evidence came directly from county-level Extension Service records
 
 
 [9]
 This evidence, incidentally, completely undercuts the defendants' suggestion, apparently accepted by both the district court and the majority on this appeal, that the regression analyses were flawed because of different salary levels from county to county. The plaintiffs' evidence indisputably established that the general pattern of average differentials existed in both "high-pay" and "low-pay" counties
 
 
 [10]
 Of course, conditions existing as of trial time would have been highly relevant to the question of the propriety and scope of declaratory and injunctive relief. But plaintiffs' claims, both those of the private parties and of the Government, were of course not limited to prospective relief
 
 
 [11]
 Plaintiffs' claims were also grounded in the fourteenth amendment, whose effective date of course long predated the origins of the challenged salary pattern. While the majority does not address this point, I assume, for purposes of this discussion, that the Evans principle would apply as well to constitutional claims, so far as it had any application. But, in line with the ensuing discussion in text, I think Evans no more precludes proof of a post-limitation pattern of salary discrimination rooted in a pattern that originated in a pre-limitation period, than Hazelwood precludes proof of a post-Act pattern of salary discrimination that carries forward differentials originating in the pre-Act period
 For sake of simplicity, I discuss the point in terms alone of the ability to prove a Title VII claim of continuing violation by a pattern or practice that originated pre-Act.
 
 
 [12]
 The majority also relies upon this theory to dismiss the probative force of the regression analyses showing statistically significant race effects in 1974 and 1975 salary structures. In the majority's view, the fact that the data used in those analyses included pre-Act as well as post-Act hires flawed the analyses, since pre-Act hiring decisions could not properly be considered in assessing Title VII liability. At 672. With all respect, that the salary data included salaries paid after 1974 to pre-Act hires is beside the point. The claim here is of a post-Act discriminatory pattern or practice in salary payments, not in hiring or work-force composition. That some of the employees claiming post-Act discrimination in salary payments were hired (and paid discriminatory salaries) pre-Act, does not make irrelevant evidence that they, with others, were paid discriminatory salaries post-Act
 
 
 [13]
 Presumably, a wholly post-Act "pattern or practice" could only be found in specific post-Act employment decisions--either in the form of a general decision to continue a pre-Act pattern or practice as a matter of deliberate post-Act judgment, or in the form of a sufficient number of discrete decisions respecting individual employees to indicate a post-Act pattern or practice that merely continued pre-Act policies into the new period. These can be seen as "continuing" violations, in that they continue pre-Act discrimination rather than merely perpetuate "past effects," see, e.g., Reed v. Lockheed Aircraft Corp., 613 F.2d 757 (9th Cir.1980)
 
 
 [14]
 The court refused as well to certify a class of 4-H Club claimants on the same principal basis that it denied the claim on the merits: that no black member of the putative class had actually been denied membership in an all-white club. On this view, there literally was no class of persons who could make the claim the court identified. As later developed on my discussion of the merits of the claim, that simply misconceives the nature of plaintiffs' claim respecting the 4-H Clubs
 
 
 [15]
 The only claim of illegal discrimination in administration of the 4-H Program now pressed by plaintiffs relates to the continuation of these segregated local clubs. As plaintiffs themselves point out, the Extension Service has been able quite effectively to remove the vestiges of discriminatory practice in all other aspects of the Program, including, for example, the operation of summer camps. See note 17, infra
 
 
 [16]
 Though the composition of particular clubs has of course changed and varied in size over time, so that some difficulty might be encountered in establishing the continuity of a particular club from its origins in state-imposed segregation, the difficulty of proof is an evidentiary one no greater than that encountered in many other contexts. The defendants' veiled suggestions that the difficulty makes a workable remedy impossible is disingenuous
 
 
 [17]
 The district court may well have been led into the error of outright rejection of this claim by assuming that only a much more Draconian remedy than the one suggested here as the appropriate one was possible. In another candid and revealing passage, the court opined
 in North Carolina as well as all other states integration of the races more frequently than not meets with strong resistance. The choice thus posed is whether it is better that the Extension Service continue to provide its much needed services to well over 100,000 North Carolina club members while striving to achieve full integration of the clubs or that it withdraw such services altogether as the government would have it do. The Extension Service has opted for the former, and in so doing this court does not perceive that it has violated the rights of anyone under any law.
 This misconceived both the nature of the plaintiffs' claim and the remedial powers available to vindicate that claim if established. Within the equitable powers of the district court lay a much wider range of possible injunctive remedies than the immediate withdrawal of all state services to all 4-H Clubs found not presently desegregated to a specific degree. Neither Title VI nor the equal protection clause required a specific degree of desegregation of these clubs at any specific time. They required only that intentional segregation be neither directly effectuated nor symbiotically encouraged by state action and that state-imposed segregation still in place be rooted out by state remedial action to the maximum extent and as speedily as possible. As plaintiffs cogently observe, the district court's assessment that no effort by the state beyond a benign freedom of choice plan could be required without risking destruction of the 4-H Clubs is belied by, among other things, the successful efforts by the Extension Service to desegregate all its other activities, including many involving 4-H Club members. The district court underestimated its powers to insure compliance by means less drastic and more adaptable to legitimate state interest than the horrible alternatives suggested by defendants as the only available ones.